(Slip Opinion) OCTOBER TERM, 2024 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

No. 24A884. Argued May 15, 2025—Decided June 27, 2025*

Plaintiffs (respondents here)—individuals, organizations, and States— filed three separate suits to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160. See Protecting the Meaning and Value of American Citizenship, 90 Fed. Reg. 8449. The Executive Order identifies circumstances in which a person born in the United States is not "subject to the jurisdiction thereof" and is thus not recognized as an American citizen. The plaintiffs allege that the Executive Order violates the Fourteenth Amendment's Citizenship Clause, §1, and §201 of the Nationality Act of 1940. In each case, the District Court entered a "universal injunction"—an injunction barring executive officials from applying the Executive Order to *anyone*, not just the plaintiffs. And in each case, the Court of Appeals denied the Government's request to stay the sweeping relief. The Government argues that the District Courts lacked equitable authority to impose universal relief and has filed three nearly identical emergency applications seeking partial stays to limit the preliminary injunctions to the plaintiffs in each case. The applications do not raise—and thus the Court does not address—the question whether the Executive Order violates the Citizenship Clause or Nationality Act. Instead, the issue the Court decides is whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions.

——————

*Together with No. 24A885, *Trump, President of the United States, et al.* v. *Washington et al.*, and No. 24A886, *Trump, President of the United States, et al.* v. *New Jersey et al.*, also on applications for partial stays.

*Held*: Universal injunctions likely exceed the equitable authority that
Congress has given to federal courts.  The Court grants the Govern-
ment's applications for a partial stay of the injunctions entered below,
but only to the extent that the injunctions are broader than necessary
to provide complete relief to each plaintiff with standing to sue.  Pp. 4–
26.

(a) The issue raised by these applications—whether Congress has
granted federal courts authority to universally enjoin the enforcement
of an executive order—plainly warrants this Court's review.  On mul-
tiple occasions, and across administrations, the Solicitor General has
asked the Court to consider the propriety of this expansive remedy.  As
the number of universal injunctions has increased over the years, so
too has the importance of the issue.  Pp. 4–5.

(b) The Government is likely to succeed on the merits of its claim
that the District Courts lacked authority to issue universal injunc-
tions.  See *Nken* v. *Holder*, 556 U. S. 418, 434 (holding that for a stay
application to be granted, the applicant must make a strong showing
of likelihood of success on the merits).  The issuance of a universal in-
junction can be justified only as an exercise of equitable authority, yet
Congress has granted federal courts no such power.  The Judiciary Act
of 1789 endowed federal courts with jurisdiction over "all suits . . . in
equity," §11, 1 Stat. 78, and still today, this statute "is what authorizes
the federal courts to issue equitable remedies," S. Bray & E. Sherwin,
Remedies 442.  This Court has held that the statutory grant encom-
passes only those sorts of equitable remedies "traditionally accorded
by courts of equity" at our country's inception. *Grupo Mexicano de De-
sarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319.

Universal injunctions are not sufficiently "analogous" to any relief
available in the court of equity in England at the time of the founding.
*Grupo Mexicano*, 527 U. S., at 318–319.  Equity offered a mechanism
for the Crown "to secure justice where it would not be secured by the
ordinary and existing processes of law."  G. Adams, The Origin of Eng-
lish Equity, 16 Colum. L. Rev. 87, 91.  This "judicial prerogative of the
King" thus extended to "those causes which the ordinary judges were
incapable of determining."  1 J. Pomeroy, Equity Jurisprudence §31,
p. 27.  Eventually, the Crown instituted the "practice of delegating the
cases" that "came before" the judicial prerogative "to the chancellor for
his sole decision."  *Id.*, §34, at 28.  The "general rule in Equity [was]
that all persons materially interested [in the suit] [were] to be made
parties to it."  J. Story, Commentaries on Equity Pleadings §72, p. 74
(Story).  Injunctions were no exception; there were "sometimes suits to
restrain the actions of particular officers against particular plaintiffs."
S. Bray, Multiple Chancellors: Reforming the National Injunction, 131
Harv. L. Rev. 417, 425 (Bray, Multiple Chancellors).  Of importance

here, suits in equity were brought by and against individual parties, and the Chancellor's remedies were generally party specific. See *Iveson* v. *Harris*, 7 Ves. 251, 257, 32 Eng. Rep. 102, 104 ("[Y]ou cannot have an injunction except against a party to the suit"). In sum, under longstanding equity practice in England, there was no remedy "remotely like a national injunction." Bray, Multiple Chancellors 425.

Nor did founding-era courts of equity in the United States chart a different course. If anything, the approach traditionally taken by federal courts cuts *against* the existence of such a sweeping remedy. Consider *Scott* v. *Donald*, where the plaintiff successfully challenged the constitutionality of a law on which state officials had relied to confiscate alcohol that the plaintiff kept for personal use. See 165 U. S. 107, 109 (statement of case); *id.*, at 111–112 (opinion of the Court). Although the plaintiff sought an injunction barring enforcement of the law against both himself and anyone "whose rights [were] infringed and threatened" by it, the Court permitted only relief benefitting the named plaintiff. *Id.*, at 115–117. In the ensuing decades, the Court consistently rebuffed requests for relief that extended beyond the parties. See, *e.g.*, *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 123; *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U. S. 447, 487–489.

The Court's early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate the Court's understanding of equity. "[N]either declaratory nor injunctive relief," the Court has said, "can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931. In fact, universal injunctions were conspicuously nonexistent for most of the Nation's history. Their absence from 18th and 19th century equity practice settles the question of judicial authority.

While "equity is flexible," *Grupo Mexicano*, 527 U. S., at 322, the Court's precedent emphasizes that its "flexibility is confined within the broad boundaries of traditional equitable relief." *Ibid.* Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act. Pp. 5–11.

(c) Respondents' counterarguments are unavailing. Pp. 11–21.

(1) In an effort to satisfy *Grupo Mexicano*'s historical test, respondents claim that universal injunctions are the modern equivalent of the decree resulting from a "bill of peace"—a form of group litigation in the Court of Chancery. Respondents contend that the existence of this historic equitable device means that federal courts have the equitable authority to issue universal injunctions under the Judiciary Act. The analogy, however, does not work. True, "bills of peace allowed

[courts of equity] to adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures." *Arizona* v. *Biden*, 40 F. 4th 375, 397 (Sutton, C. J., concurring). Unlike universal injunctions, however, which reach *anyone* affected by executive or legislative action, bills of peace involved a "group [that] was small and cohesive." Bray, Multiple Chancellors 426. And unlike universal injunctions, which bind only the parties to the suit, decrees resulting from a bill of peace "would bind all members of the group, whether they were present in the action or not." 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1751, at 10.

The bill of peace lives in modern form, but not as the universal injunction. It is instead analogous to the modern class action—which, in federal court, is governed by Rule 23 of the Federal Rules of Civil Procedure. See *ibid.* Rule 23 requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties who adequately protect the interests of the class. Fed. Rule Civ. Proc. 23(a). The requirements for a bill of peace were virtually identical. See 7A Wright, Federal Practice and Procedure §1751, at 10 and n. 4. By forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions impermissibly circumvent Rule 23's procedural protections. Pp. 12–15.

(2) Respondents contend that universal injunctions—or at least *these* universal injunctions—are simply an application of the principle that a court of equity may fashion a remedy that awards complete relief. But "complete relief" is not synonymous with "universal relief." It is a narrower concept, long embraced in the equitable tradition, that allows courts to "administer complete relief *between the parties.*" *Kinney-Coastal Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (emphasis added). To be sure, party-specific injunctions sometimes "advantag[e] nonparties," *Trump* v. *Hawaii*, 585 U. S 667, 717 (THOMAS, J., concurring), but they do so only incidentally.

Here, prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff will give that plaintiff complete relief: Her child will not be denied citizenship. And extending the injunction to cover everyone similarly situated would not render *her* relief any more complete. So the individual and associational respondents are wrong to characterize the universal injunction as simply an application of the complete-relief principle. The inquiry is more complicated for the state respondents, because the relevant injunction does not purport to directly benefit nonparties. Instead, the District Court for the District of Massachusetts decided that a universal injunction was necessary to provide the States *themselves* complete re-

lief. As the States see it, their harms—financial injuries and the administrative burdens flowing from citizen-dependent benefits programs—cannot be remedied without a blanket ban on the enforcement of the Executive Order. Children often move across state lines or are born outside their parents' State of residence. Given the cross-border flow, the States say, a "patchwork injunction" would prove unworkable for the provision of certain federally funded benefits. The Government retorts that even if the injunction is designed to benefit only the States, it is "more burdensome than necessary to redress" their asserted harms, see *Califano* v. *Yamasaki*, 442 U. S. 682, 702, and that narrower relief is appropriate. The Court declines to take up these arguments in the first instance. The lower courts should determine whether a narrower injunction is appropriate, so we leave it to them to consider these and any related arguments. Pp. 15–19.

(3) Respondents defend universal injunctions as a matter of policy; the Government advances policy arguments running the other way. As with most questions of law, the policy pros and cons are beside the point. Under the Court's well-established precedent, see *Grupo Mexicano*, 527 U. S., at 319, because universal injunctions lack a founding-era forebear, federal courts lack authority to issue them. Pp. 19–21.

(d) To obtain interim relief, the Government must show that it is likely to suffer irreparable harm absent a stay. *Nken*, 556 U. S., at 434–435. When a federal court enters a universal injunction against the Government, it "improper[ly] intru[des]" on "a coordinate branch of the Government" and prevents the Government from enforcing its policies against nonparties. *INS* v. *Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U. S. 1301, 1306 (O'Connor, J., in chambers); see also *Maryland* v. *King*, 567 U. S. 1301, 1303 (ROBERTS, C. J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'" (alteration in original)). The Court's practice also demonstrates that an applicant need not show it will prevail on the underlying merits when it seeks a stay on a threshold issue. See, *e.g.*, *Gutierrez* v. *Saenz*, 603 U. S. ___; *OPM* v. *AFGE*, 604 U. S. ___. The Government here is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act. And the balance of equities does not counsel against awarding the Government interim relief: A partial stay will cause no harm to respondents because they will remain protected by the preliminary injunctions to the extent necessary and appropriate to afford them complete relief. Pp. 24–26.

(e) When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too. The

Syllabus

Government's applications for partial stays of the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue.  P. 26.

Applications for partial stays granted.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. ALITO, J., filed a concurring opinion, in which THOMAS, J., joined. KAVANAUGH, J., filed a concurring opinion.  SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.  JACKSON, J., filed a dissenting opinion.

# SUPREME COURT OF THE UNITED STATES

---

No. 24A884

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

---

No. 24A885

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

### ON APPLICATION FOR PARTIAL STAY

---

No. 24A886

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

### ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE BARRETT delivered the opinion of the Court.

The United States has filed three emergency applications challenging the scope of a federal court's authority to enjoin Government officials from enforcing an executive order. Traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit. The injunctions before us today reflect a more recent development: district courts asserting the power to prohibit enforcement of a law or policy against *anyone*. These injunctions—known as "universal injunctions"—likely exceed the equitable authority that

Congress has granted to federal courts.[1] We therefore grant
the Government's applications to partially stay the injunc-
tions entered below.

I

The applications before us concern three overlapping,
universal preliminary injunctions entered by three differ-
ent District Courts. See 763 F. Supp. 3d 723 (Md. 2025),
appeal pending, No. 25–1153 (CA4); 765 F. Supp. 3d 1142
(WD Wash. 2025), appeal pending, No. 25–807 (CA9); *Doe*
v. *Trump*, 766 F. Supp. 3d 266 (Mass. 2025), appeal pend-
ing, No. 25–1170 (CA1). The plaintiffs—individuals, organ-
izations, and States—sought to enjoin the implementation
and enforcement of President Trump's Executive Order No.
14160.[2] See Protecting the Meaning and Value of American
Citizenship, 90 Fed. Reg. 8449 (2025). The Executive Order
identifies circumstances in which a person born in the
United States is not "subject to the jurisdiction thereof" and

———————

[1] Such injunctions are sometimes called "nationwide injunctions," re-
flecting their use by a single district court to bar the enforcement of a
law anywhere in the Nation. But the term "universal" better captures
how these injunctions work. Even a traditional, parties-only injunction
can apply beyond the jurisdiction of the issuing court. *Steele* v. *Bulova
Watch Co.*, 344 U. S. 280, 289 (1952) (When "exercising its equity pow-
ers," a district court "may command persons properly before it to cease
or perform acts outside its territorial jurisdiction"). The difference be-
tween a traditional injunction and a universal injunction is not so much
*where* it applies, but *whom* it protects: A universal injunction prohibits
the Government from enforcing the law against *anyone*, anywhere. H.
Wasserman, "Nationwide" Injunctions Are Really "Universal" Injunc-
tions and They Are Never Appropriate, 22 Lewis & Clark L. Rev. 335,
338 (2018).

[2] The Government does not dispute—nor could it—that the individual
plaintiffs have standing to sue. But it argues that the States lack third-
party standing because their claims rest exclusively on the rights of in-
dividuals. Application for Partial Stay of Injunction in No. 24A884,
pp. 28–32. It also challenges the District Courts' authority to grant relief
to the organizations' members who are not identified in the complaints.
See *id.*, at 22. We do not address these arguments.

is thus not recognized as an American citizen. See *ibid*. Specifically, it sets forth the "policy of the United States" to no longer issue or accept documentation of citizenship in two scenarios: "(1) when [a] person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when [a] person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth." *Ibid*. The Executive Order also provides for a 30-day ramp-up period. During that time, the order directs executive agencies to develop and issue public guidance regarding the order's implementation. See *id*., at 8449–8450.

The plaintiffs filed suit, alleging that the Executive Order violates the Fourteenth Amendment's Citizenship Clause, §1, as well as §201 of the Nationality Act of 1940, 54 Stat. 1138 (codified at 8 U. S. C. §1401). In each case, the District Court concluded that the Executive Order is likely unlawful and entered a universal preliminary injunction barring various executive officials from applying the policy to *anyone* in the country. And in each case, the Court of Appeals denied the Government's request to stay the sweeping relief. See 2025 WL 654902 (CA4, Feb. 28, 2025); 2025 WL 553485 (CA9, Feb. 19, 2025); 131 F. 4th 27 (CA1 2025).

The Government has now filed three nearly identical applications seeking to partially stay the universal preliminary injunctions and limit them to the parties. See Application for Partial Stay of Injunction in No. 24A884; Application for Partial Stay of Injunction in No. 24A885; Application for Partial Stay of Injunction in No. 24A886.[3] The applications do not raise—and thus we do not address—the question whether the Executive Order violates

_____

[3] Because the applications are materially identical, we cite only the application in No. 24A884 throughout the rest of the opinion.

the Citizenship Clause or Nationality Act. The issue before us is one of remedy: whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions.

## II

The question whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy plainly warrants our review, as Members of this Court have repeatedly emphasized. See, *e.g.*, *McHenry* v. *Texas Top Cop Shop*, 604 U. S. ___, ___ (2025) (GORSUCH, J., concurring in grant of stay) (slip op., at 1) ("I would . . . take this case now to resolve definitively the question whether a district court may issue universal injunctive relief"); *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (GORSUCH, J., joined by THOMAS and ALITO, JJ., concurring in grant of stay) (slip op., at 7–8) ("[T]he propriety of universal injunctive relief [is] a question of great significance that has been in need of the Court's attention for some time"); *Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ___, ___ (2023) (statement of KAVANAUGH, J., joined by BARRETT, J., except as to footnote 1, respecting denial of application for stay) (slip op., at 3) (Universal injunctions present "an important question that could warrant our review in the future"); *Trump* v. *Hawaii*, 585 U. S. 667, 713 (2018) (THOMAS, J., concurring) ("If [universal injunctions'] popularity continues, this Court must address their legality"). On multiple occasions, and across administrations, the Solicitor General has asked us to consider the propriety of this expansive remedy. See, *e.g.*, Application for Stay of Injunction in *McHenry* v. *Texas Top Cop Shop*, *Inc.*, O. T. 2024, No. 24A653 (Biden administration); Brief for Petitioners in *Trump* v. *Hawaii*, O. T. 2017, No. 17–965 (first Trump administration).

It is easy to see why. By the end of the Biden administration, we had reached "a state of affairs where almost every

major presidential act [was] immediately frozen by a federal district court." W. Baude & S. Bray, Comment, Proper Parties, Proper Relief, 137 Harv. L. Rev. 153, 174 (2023). The trend has continued: During the first 100 days of the second Trump administration, district courts issued approximately 25 universal injunctions. Congressional Research Service, J. Lampe, Nationwide Injunctions in the First Hundred Days of the Second Trump Administration 1 (May 16, 2025). As the number of universal injunctions has increased, so too has the importance of the issue.

### III

### A

The Government is likely to succeed on the merits of its argument regarding the scope of relief. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (holding that for a stay application to be granted, the applicant must make "'a strong showing that [it] is likely to succeed on the merits'"). A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power.[4]

The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," §11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies," S. Bray & E. Sherwin, Remedies 442 (4th ed. 2024). Though flexible, this equitable authority is not freewheeling. We have held that the statutory grant encompasses only those sorts of equitable remedies "traditionally accorded by courts of equity" at our country's inception. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319 (1999); see also, *e.g.*, *Payne* v. *Hook*, 7 Wall. 425, 430 (1869) ("The equity jurisdiction conferred on the Federal courts is the same

—————

[4] Our decision rests solely on the statutory authority that federal courts possess under the Judiciary Act of 1789. We express no view on the Government's argument that Article III forecloses universal relief.

that the High Court of Chancery in England possesses").[5]
We must therefore ask whether universal injunctions are
sufficiently "analogous" to the relief issued "'by the High
Court of Chancery in England at the time of the adoption of
the Constitution and the enactment of the original Judici-
ary Act.'" *Grupo Mexicano*, 527 U. S., at 318–319 (quoting
A. Dobie, Handbook of Federal Jurisdiction and Procedure
660 (1928)).

The answer is no: Neither the universal injunction nor
any analogous form of relief was available in the High
Court of Chancery in England at the time of the founding.
Equity offered a mechanism for the Crown "to secure justice
where it would not be secured by the ordinary and existing
processes of law." G. Adams, The Origin of English Equity,
16 Colum. L. Rev. 87, 91 (1916). This "judicial prerogative
of the King" thus extended to "those causes which the ordi-
nary judges were incapable of determining." 1 J. Pomeroy,
Equity Jurisprudence §31, p. 27 (1881). Eventually, the
Crown instituted the "practice of delegating the cases" that
"came before" the judicial prerogative "to the chancellor for
his sole decision." *Id.*, §34, at 28. This "became the common
mode of dealing with such controversies." *Ibid.*

Of importance here, suits in equity were brought by and
against individual parties. Indeed, the "general rule in Eq-
uity [was] that all persons materially interested [in the
suit] [were] to be made parties to it." J. Story, Commen-
taries on Equity Pleadings §72, p. 74 (2d ed. 1840) (Story).
Injunctions were no exception; there were "sometimes suits

_____

[5] See also *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945) ("[T]he
federal courts [have] no power that they would not have had in any event
when courts were given 'cognizance,' by the first Judiciary Act, of suits
'in equity'"); *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 658 (1832) ("[T]he
settled doctrine of this court is, that the remedies in equity are to be ad-
ministered, not according to the state practice, but according to the prac-
tice of courts of equity in the parent country").

to restrain the actions of *particular* officers against *particular* plaintiffs." S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 425 (2017) (Bray, Multiple Chancellors) (emphasis added). And in certain cases, the "Attorney General could be a defendant." *Ibid.* The Chancellor's remedies were also typically party specific. "As a general rule, an injunction" could not bind one who was not a "party to the cause." F. Calvert, Suits in Equity 120 (2d ed. 1847); see also *Iveson* v. *Harris*, 7 Ves. 251, 257, 32 Eng. Rep. 102, 104 (1802) ("[Y]ou cannot have an injunction except against a party to the suit"). Suffice it to say, then, under longstanding equity practice in England, there was no remedy "remotely like a national injunction." Bray, Multiple Chancellors 425.

Nor did founding-era courts of equity in the United States chart a different course. See 1 Pomeroy, Equity Jurisprudence §41, at 33–34. If anything, the approach traditionally taken by federal courts cuts *against* the existence of such a sweeping remedy. Consider *Scott* v. *Donald*, where the plaintiff successfully challenged the constitutionality of a law on which state officials had relied to confiscate alcohol that the plaintiff kept for personal use. See 165 U. S. 107, 109 (1897) (statement of case); *id.*, at 111–112 (opinion of the Court). Although the plaintiff sought an injunction barring enforcement of the law against both himself and anyone else "whose rights [were] infringed and threatened" by it, this Court permitted only a narrower decree between "the parties named as plaintiff and defendants in the bill." *Id.*, at 115–117.[6]

_____

[6] Though the principal dissent claims otherwise, we do not treat *Scott* as "dispositive." *Post*, at 28 (opinion of SOTOMAYOR, J.). Under *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308 (1999), the lack of a historical analogue is dispositive. *Scott* simply illustrates that as late as 1897, this Court adhered to a party-specific view of relief. And while the principal dissent relies on *Smyth* v. *Ames*, 169 U. S. 466, 518 (1898), as a counterexample to *Scott*, see *post*, at 28 (opinion of

In the ensuing decades, we consistently rebuffed requests
for relief that extended beyond the parties. See, *e.g.*, *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 123 (1940) ("The
benefits of [the court's] injunction" improperly extended "to
bidders throughout the Nation who were not parties to any
proceeding, who were not before the court[,] and who had
sought no relief"); cf. *Frothingham* v. *Mellon*, decided with
*Massachusetts* v. *Mellon*, 262 U. S. 447, 487–489 (1923)
(concluding that the Court lacked authority to issue "preventive relief" that would apply to people who "suffe[r] in
some indefinite way in common with people generally");
Bray, Multiple Chancellors 433 (explaining that the *Frothingham* analysis "intertwines concepts of equity, remedies,
and the judicial power"). As Justice Nelson put it while riding circuit, "[t]here is scarcely a suit at law, or in equity, . . .
in which a general statute is interpreted, that does not involve a question in which other parties are interested." *Cutting* v. *Gilbert*, 6 F. Cas. 1079, 1080 (No. 3,519) (CC SDNY
1865). But to allow all persons subject to the statute to be
treated as parties to a lawsuit "would confound the established order of judicial proceedings." *Ibid*.

Our early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate our
understanding of equity. "[N]either declaratory nor injunctive relief," we have said, "can directly interfere with enforcement of contested statutes or ordinances except with
respect to the particular federal plaintiffs." *Doran* v. *Salem
Inn, Inc.*, 422 U. S. 922, 931 (1975); see also *Gregory* v. *Stetson*, 133 U. S. 579, 586 (1890) ("It is an elementary principle

––––––––

SOTOMAYOR, J.), it is unclear why. Even supporters of the universal injunction recognize that "the decree [that *Smyth*] affirmed did not reach
beyond the parties." M. Sohoni, The Lost History of the "Universal" Injunction, 133 Harv. L. Rev. 920, 939 (2020); *Smyth*, 169 U. S., at 476–477
(statement of case) (quoting circuit court order that enjoined state officials from enforcing the statute "against *said* railroad companies" (emphasis added)).

that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it. This principle is fundamental"); Baude, 137 Harv. L. Rev., at 168 (noting the "party-specific understanding of what equitable remedies do").

In fact, universal injunctions were not a feature of federal-court litigation until sometime in the 20th century. See Bray, Multiple Chancellors 448–452 (discussing various rationales for the birth of the universal injunction); see also Application in No. 24A884, at 17–18. The D. C. Circuit issued what some regard as the first universal injunction in 1963. See *Wirtz* v. *Baldor Elec. Co.*, 337 F. 2d 518, 535 (enjoining the Secretary of Labor "with respect to the entire [electric motors and generators] industry," not just the named plaintiffs to the lawsuit).[7] Yet such injunctions remained rare until the turn of the 21st century, when their use gradually accelerated. See Bray, Multiple Chancellors 439–443 (referencing *Flast* v. *Cohen*, 392 U. S. 83 (1968), and *Harlem Valley Transp. Assn.* v. *Stafford*, 360 F. Supp. 1057 (SDNY 1973)). One study identified approximately 127 universal injunctions issued between 1963 and 2023.

─────────

[7] There is some dispute about whether *Wirtz* was the first universal injunction. Professor Mila Sohoni points to other possible 20th-century examples, including *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), and *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913). See M. Sohoni, 133 Harv. L. Rev., at 943; Brief for Professor Mila Sohoni as *Amica Curiae* 3; see also *post*, at 21 (opinion of SOTOMAYOR, J.). But see M. Morley, Disaggregating the History of Nationwide Injunctions: A Response to Professor Sohoni, 72 Ala. L. Rev. 239, 252–256 (2020) (disputing these examples). Regardless, under any account, universal injunctions postdated the founding by more than a century—and under *Grupo Mexicano*, equitable authority exercised under the Judiciary Act must derive from founding-era practice. 527 U. S., at 319. It also bears emphasis that none of these cases addresses the propriety of universal relief. Like a "drive-by-jurisdictional rulin[g]," implicit acquiescence to a broad remedy "ha[s] no precedential effect." *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 91 (1998).

See District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev. 1701, 1705 (2024). Ninety-six of them—over three quarters—were issued during the administrations of President George W. Bush, President Obama, President Trump, and President Biden. *Ibid.*

The bottom line? The universal injunction was conspicuously nonexistent for most of our Nation's history. Its absence from 18th- and 19th-century equity practice settles the question of judicial authority.[8] See *Grupo Mexicano*, 527 U. S., at 318–319. That the absence continued into the 20th century renders any claim of historical pedigree still more implausible. Even during the "deluge of constitutional litigation that occurred in the wake of *Ex parte Young*, throughout the *Lochner* Era, and at the dawn of the New Deal," universal injunctions were nowhere to be found. M. Morley, Disaggregating the History of Nationwide Injunctions: A Response to Professor Sohoni, 72 Ala. L. Rev. 239, 252 (2020) (footnotes omitted). Had federal courts believed themselves to possess the tool, surely they would not have let it lie idle.

Faced with this timeline, the principal dissent accuses us of "misunderstand[ing] the nature of equity" as being "fr[ozen] in amber . . . at the time of the Judiciary Act." *Post*, at 29 (opinion of SOTOMAYOR, J.). Not so. We said it before, see *supra*, at 5, and say it again: "[E]quity is flexible." *Grupo Mexicano*, 527 U. S., at 322. At the same time, its "flexibility is confined within the broad boundaries of

———————

[8] The principal dissent faults us for failing to identify a single founding-era case in which this Court held that universal injunctions exceed a federal court's equitable authority. See *post*, at 29 (opinion of SOTOMAYOR, J.). But this absence only bolsters our case. That this Court had no occasion to reject the universal injunction as inconsistent with traditional equity practice merely demonstrates that no party even bothered to ask for such a sweeping remedy—because no court would have entertained the request. Cf. *Grupo Mexicano*, 527 U. S., at 332 ("[E]quitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence").

traditional equitable relief."[9]  *Ibid.*  A modern device need not have an exact historical match, but under *Grupo Mexicano*, it must have a founding-era antecedent.  And neither the universal injunction nor a sufficiently comparable predecessor was available from a court of equity at the time of our country's inception.  See *id.*, at 333.  Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act.[10]  See *id.,* at 318–319.

## B

Respondents raise several counterarguments, which the principal dissent echoes.  First, they insist that the universal injunction has a sufficient historical analogue: a decree resulting from a bill of peace.  Second, they maintain that

---

[9] Notwithstanding *Grupo Mexicano*, the principal dissent invokes *Ex parte Young*, 209 U. S. 123 (1908), as support for the proposition that equity can encompass remedies that have "no analogue in the relief exercised in the English Court of Chancery," because *Ex parte Young* permits plaintiffs to "obtain plaintiff-protective injunctions against Government officials," and the English Court of Chancery "could not enjoin the Crown or English officers," *post*, at 30 (opinion of SOTOMAYOR, J.).  But contrary to the principal dissent's suggestion, *Ex parte Young* does not say—either explicitly or implicitly—that courts may devise novel remedies that have no background in traditional equitable practice.  Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct.  *Ex parte Young* justifies its holding by reference to a long line of cases authorizing suits against state officials in certain circumstances.  See 209 U. S., at 150–152 (citing, *e.g.*, *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824); *Governor of Georgia* v. *Madrazo*, 1 Pet. 110 (1828); and *Davis* v. *Gray*, 16 Wall. 203 (1873)).  Support for the principal dissent's approach is found not in *Ex parte Young*, but in Justice Ginsburg's partial dissent in *Grupo Mexicano*, which eschews the governing historical approach in favor of "[a] dynamic equity jurisprudence."  527 U. S., at 337 (opinion concurring in part and dissenting in part).

[10] Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.  See 5 U. S. C. §706(2) (authorizing courts to "hold unlawful and set aside agency action").

universal injunctions are consistent with the principle that a court of equity may fashion complete relief for the parties. Third, they argue that universal injunctions serve important policy objectives.

1

In an effort to satisfy *Grupo Mexicano*'s historical test, respondents claim that universal injunctive relief *does* have a founding-era forebear: the decree obtained on a "bill of peace," which was a form of group litigation permitted in English courts. See Opposition to Application in No. 24A884 (*CASA*), pp. 30–31; see also Brief for Professor Mila Sohoni as *Amica Curiae* 6–8. This bill allowed the Chancellor to consolidate multiple suits that involved a "common claim the plaintiff could have against multiple defendants" or "some kind of common claim that multiple plaintiffs could have against a single defendant." Bray, Multiple Chancellors 426; see *How* v. *Tenants of Bromsgrove*, 1 Vern. 22, 23 Eng. Rep. 277 (1681) (suit by a lord against his tenants collectively); *Brown* v. *Vermuden*, 1 Ch. Ca. 283, 22 Eng. Rep. 802 (1676), and *Brown* v. *Vermuden*, 1 Ch. Ca. 272, 22 Eng. Rep. 796 (1676) (suit by a parson against lead miners in a parish, who named four of their members to defend the suit in a representative capacity). Universal injunctions are analogous to this traditional equitable device, respondents say, so federal courts have authority under the Judiciary Act to issue them.

The analogy does not work. True, "bills of peace allowed [courts of equity] to adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures." *Arizona* v. *Biden*, 40 F. 4th 375, 397 (CA6 2022) (Sutton, C. J., concurring); see Story §§120–135 (discussing representative suits). Even so, their use was confined to limited circumstances. See 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1751, p. 10, and n. 4 (4th ed. 2021) (citing *Adair* v.

*New River Co.*, 11 Ves. 429, 32 Eng. Rep. 1154 (Ch. 1803)). Unlike universal injunctions, which reach *anyone* affected by legislative or executive action—no matter how large the group or how tangential the effect—a bill of peace involved a "group [that] was small and cohesive," and the suit did not "resolve a question of legal interpretation for the entire realm." Bray, Multiple Chancellors 426. And unlike universal injunctions, which bind only the parties to the suit, decrees obtained on a bill of peace "would bind all members of the group, whether they were present in the action or not." 7A Wright, Federal Practice and Procedure §1751, at 10; see *Smith* v. *Swormstedt*, 16 How. 288, 303 (1854) (When "a court of equity permits a portion of the parties in interest to represent the entire body . . . the decree binds all of them the same as if all were before the court"); see also Story §120 ("[I]n most, if not in all, cases of this sort, the decree obtained upon such a Bill will ordinarily be held binding upon all other persons standing in the same predicament"). As Chief Judge Sutton aptly put it, "[t]he domesticated animal known as a bill of peace looks nothing like the dragon of nationwide injunctions." *Arizona*, 40 F. 4th, at 397 (concurring opinion).

The bill of peace lives in modern form, but not as the universal injunction. It evolved into the modern class action, which is governed in federal court by Rule 23 of the Federal Rules of Civil Procedure. 7A Wright, Federal Practice and Procedure §1751, at 10 ("It was the English bill of peace that developed into what is now known as the class action"); see *Hansberry* v. *Lee*, 311 U. S. 32, 41 (1940) ("The class suit was an invention of equity"). And while Rule 23 is in some ways "more restrictive of representative suits than the original bills of peace," *Rodgers* v. *Bryant*, 942 F. 3d 451, 464 (CA8 2019) (Stras, J., concurring), it would still be recognizable to an English Chancellor. Rule 23 requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties

who adequately protect the interests of the class. Fed. Rule Civ. Proc. 23(a). The requirements for a bill of peace were virtually identical. See 7A Wright, Federal Practice and Procedure §1751, at 10, and n. 4 (citing *Adair*, 11 Ves. 429, 32 Eng. Rep. 1154). None of these requirements is a prerequisite for a universal injunction.

Rule 23's limits on class actions underscore a significant problem with universal injunctions. A "'properly conducted class action,'" we have said, "can come about in federal courts in just one way—through the procedure set out in Rule 23." *Smith* v. *Bayer Corp.*, 564 U. S. 299, 315 (2011); Fed. Rule Civ. Proc. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members *only if*" Rule 23(a)'s requirements are satisfied (emphasis added)). Yet by forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions circumvent Rule 23's procedural protections and allow "'courts to "create *de facto* class actions at will."'" *Smith*, 564 U. S., at 315 (quoting *Taylor* v. *Sturgell*, 553 U. S. 880, 901 (2008)). Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table? Cf. *Grupo Mexicano*, 527 U. S., at 330–331 ("Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?"). The principal dissent's suggestion that these suits *could* have satisfied Rule 23's requirements simply proves that universal injunctions are a class-action workaround. *Post*, at 25–26 (opinion of SOTOMAYOR, J.).

The taxpayer suit is a similarly inadequate historical analogy. Contra, *post*, at 24–25. In a successful taxpayer suit, a court would enjoin the collection of an unlawful tax against "taxpayers joined as co-plaintiffs, or by one taxpayer suing on behalf of himself and all others similarly situated." 1 Pomeroy, Equity Jurisprudence §260, at 277. To be sure, some state courts would occasionally "enjoin the

enforcement and collection" of taxes against an "entire community," even when a "single taxpayer su[ed] on his own account." *Id.*, at 277–278. But the practice of extending relief "with respect to any taxpayer" was not adopted by state courts until the mid-19th century, and even then, not all states were willing to provide such sweeping relief. See Bray, Multiple Chancellors 427. This post-founding practice of some state courts thus sheds minimal light on federal courts' equitable authority under the Judiciary Act. What is more, in *Frothingham*, we refused to allow a single taxpayer to challenge a federal appropriations act. 262 U. S., at 486–487. That counsels against placing much, if any, reliance on taxpayer suits as justification for the modern universal injunction.

2

Respondents contend that universal injunctions—or at least *these* universal injunctions—are consistent with the principle that a court of equity may fashion a remedy that awards complete relief. See Opposition to Application in No. 24A884 (*CASA*), at 22–25; Opposition to Application in No. 24A885 (*Washington*), pp. 28–32; Opposition to Application in No. 24A886 (*New Jersey*), pp. 31–39. We agree that the complete-relief principle has deep roots in equity. But to the extent respondents argue that it justifies the award of relief to nonparties, they are mistaken.[11]

———————

[11] JUSTICE JACKSON, for her part, thinks the "premise" that universal injunctions provide relief to nonparties is "suspect" because, in her view, "[n]onparties may *benefit* from an injunction, but only the plaintiff gets *relief*." *Post*, at 8–9, n. 2 (dissenting opinion). The availability of contempt proceedings suggests otherwise. Consider the civil contempt context. Under "traditional principles of equity practice," courts may "impos[e] civil contempt sanctions to 'coerce [a] defendant into compliance' with an injunction." *Taggart* v. *Lorenzen*, 587 U. S. 554, 560 (2019) (quoting *United States* v. *Mine Workers*, 330 U. S. 258, 303–304 (1947)). Generally, civil contempt proceedings occur between the original parties to the lawsuit. See *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418,

"Complete relief" is not synonymous with "universal re-lief." It is a narrower concept: The equitable tradition has long embraced the rule that courts generally "may administer complete relief *between the parties*." *Kinney-Coastal Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (1928) (emphasis added). While party-specific injunctions sometimes "advantag[e] nonparties," *Trump*, 585 U. S., at 717 (THOMAS, J., concurring), they do so only incidentally.

Consider an archetypal case: a nuisance in which one neighbor sues another for blasting loud music at all hours of the night. To afford the plaintiff complete relief, the court has only one feasible option: order the defendant to turn her music down—or better yet, off. That order will necessarily benefit the defendant's surrounding neighbors too; there is no way "to peel off just the portion of the nuisance that harmed the plaintiff." *Rodgers*, 942 F. 3d, at 462 (Stras, J., concurring); see A. Woolhandler & C. Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 702 (2004). But while the court's injunction might have the *practical effect* of benefiting nonparties, "that benefit [is] merely incidental." *Trump*, 585 U. S., at 717 (THOMAS, J., concurring); see also 3 J. Pomeroy, Equity Jurisprudence §1349, pp. 380–381 (1883).[12] As a matter of law, the injunc-

––––––––

444–445 (1911). But a federal court's "power in civil contempt proceedings is determined by the requirements of full remedial relief" to "effect compliance with its decree." *McComb* v. *Jacksonville Paper Co.*, 336 U. S. 187, 193–194 (1949). And "[w]hen an order grants relief for a non-party," as is the case with universal injunctions,"the procedure for enforcing the order is the same as for a party." Fed. Rule Civ. Proc. 71; see, *e.g.*, *Zamecnik* v. *Indiana Prairie School Dist. No. 204*, 636 F. 3d 874, 879 (CA7 2011). So a nonparty covered by a universal injunction is likely to reap both the practical benefit and the formal relief of the injunction. See M. Smith, Only Where Justified: Toward Limits and Explanatory Requirements for Nationwide Injunctions, 95 Notre Dame L. Rev. 2013, 2019 (2020).

[12] There may be other injuries for which it is all but impossible for

tion's protection extends only to the suing plaintiff—as evidenced by the fact that only the plaintiff can enforce the judgment against the defendant responsible for the nuisance. If the nuisance persists, and another neighbor wants to shut it down, she must file her own suit.[13]

The individual and associational respondents are therefore wrong to characterize the universal injunction as simply an application of the complete-relief principle. Under this principle, the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*. See *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added)). Here, prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff will give that plaintiff complete relief: Her child will not be denied citizenship. Extending the injunction to cover all other similarly situated individuals would not render *her* relief any more complete.

The complete-relief inquiry is more complicated for the state respondents, because the relevant injunction does not purport to directly benefit nonparties. Instead, the District Court for the District of Massachusetts decided that a uni-

---

courts to craft relief that is complete *and* benefits only the named plaintiffs. See, *e.g.*, *Shaw* v. *Hunt*, 517 U. S. 899 (1996) (racially gerrymandered congressional maps).

[13] The new plaintiff might be able to assert nonmutual offensive issue preclusion. See *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 331–332 (1979) (setting forth prerequisites for applying the doctrine). But nonmutual offensive issue preclusion is unavailable against the United States. *United States* v. *Mendoza*, 464 U. S. 154, 155 (1984). That universal injunctions end-run this rule is one of the Government's objections to them.

versal injunction was necessary to provide the States *themselves* with complete relief. See 766 F. Supp. 3d, at 288.[14] The States maintain that the District Court made the right call. See Opposition to Application in No. 24A886 (*New Jersey*), at 31–39.

As the States see it, their harms—financial injuries and the administrative burdens flowing from citizen-dependent benefits programs—cannot be remedied without a blanket ban on the enforcement of the Executive Order. See, *e.g.*, *id.*, at 9–11. Children often move across state lines or are born outside their parents' State of residence. *Id.*, at 31, 35. Given the cross-border flow, the States say, a "patchwork injunction" would prove unworkable, because it would require them to track and verify the immigration status of the parents of every child, along with the birth State of every child for whom they provide certain federally funded benefits. *Ibid.*

The Government—unsurprisingly—sees matters differently. It retorts that even if the injunction is designed to benefit only the States, it is "more burdensome than necessary to redress" their asserted harms. *Califano*, 442 U. S., at 702. After all, to say that a court *can* award complete relief is not to say that it *should* do so. Complete relief is not a guarantee—it is the maximum a court can provide. And in equity, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." S. Bray & P. Miller, Getting into Equity, 97 Notre Dame L. Rev. 1763, 1797 (2022). In short, "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329

—————

[14] The District Court for the Western District of Washington acknowledged the state respondents' complete-relief argument but primarily granted a universal injunction on the basis that the "extreme nature of the equities . . . alone warrant[ed] nationwide relief." 765 F. Supp. 3d 1142, 1153 (2025).

(1944).

Leaning on these principles, the Government contends that narrower relief is appropriate. For instance, the District Court could forbid the Government to apply the Executive Order within the respondent States, including to children born elsewhere but living in those States. Application in No. 24A884, at 23. Or, the Government says, the District Court could direct the Government to "treat covered children as eligible for purposes of federally funded welfare benefits." *Ibid.* It asks us to stay the injunction insofar as it sweeps too broadly.

We decline to take up these arguments in the first instance. The lower courts should determine whether a narrower injunction is appropriate; we therefore leave it to them to consider these and any related arguments.

3

Respondents also defend universal injunctions as a matter of policy. They argue that a universal injunction is sometimes the only practical way to quickly protect groups from unlawful government action. See Opposition to Application in No. 24A884 (*CASA*), at 26–27; see also A. Frost, In Defense of Nationwide Injunctions, 93 N. Y. U. L. Rev. 1065, 1090–1094 (2018) (suggesting that universal injunctions are appropriate when not all interested individuals can come quickly to court); *post*, at 37–39 (SOTOMAYOR, J., dissenting). Respondents also contend that universal injunctions are an appropriate remedy to preserve equal treatment among individuals when the Executive Branch adopts a facially unlawful policy. Opposition to Application in No. 24A884 (*CASA*), at 25–27; cf. *post*, at 22 (SOTOMAYOR, J., dissenting). And they suggest that forcing plaintiffs to proceed on an individual basis can result in confusion or piecemeal litigation that imposes unnecessary costs on courts and others. See Opposition to Application in No. 24A885 (*Washington*), at 31–32; Frost, 93 N. Y. U.

L. Rev., at 1098–1101; see also *post*, at 31 (SOTOMAYOR, J., dissenting). So, they insist, universal injunctions must be permitted for the good of the system.

The Government advances policy arguments running the other way. Echoing Chief Judge Sutton, the Government asserts that avoiding a patchwork enforcement system is a justification that "lacks a limiting principle and would make nationwide injunctions the rule rather than the exception" for challenges to many kinds of federal law. *Arizona*, 40 F. 4th, at 397 (concurring opinion). It stresses—as the principal dissent also observes—that universal injunctions incentivize forum shopping, since a successful challenge in one jurisdiction entails relief nationwide. See Application in No. 24A884, at 19–20; see also *post*, at 22 (opinion of SOTOMAYOR, J.). In a similar vein, the Government observes that universal injunctions operate asymmetrically: A plaintiff must win just one suit to secure sweeping relief. But to fend off such an injunction, the Government must win everywhere. See Application in No. 24A884, at 19–20; see also *post*, at 22–23 (opinion of SOTOMAYOR, J.) (acknowledging this concern).[15] Moreover, the Government contends, the practice of universal injunctions means that highly consequential cases are often decided in a "fast and furious" process of "'rushed, high-stakes, [and] low-information'" decisionmaking. *Labrador*, 601 U. S., at ___ (slip op., at 12) (GORSUCH, J., concurring in grant of stay). When a district court issues a universal injunction, thereby halting the enforcement of federal policy, the Government says that it has little recourse but to proceed to the court of appeals for an emergency stay. The loser in the court of

_____

[15] The Government contrasts this with class actions. A judgment in a Rule 23 class action (favorable or not) binds the whole class—so if the defendant wins, it is protected from future suits. But because an adverse ruling on a request for universal relief lacks this preclusive effect, plaintiffs can continue to file in different forums until they find a court willing to award such relief.

appeals will then seek a stay from this Court. See Application in No. 24A884, at 20. This process forces courts to resolve significant and difficult questions of law on a highly expedited basis and without full briefing. See *ibid*.[16]

The upshot: As with most disputed issues, there are arguments on both sides. But as with most questions of law, the policy pros and cons are beside the point. Under our well-established precedent, the equitable relief available in the federal courts is that "traditionally accorded by courts of equity" at the time of our founding. *Grupo Mexicano*, 527 U. S., at 319. Nothing like a universal injunction was available at the founding, or for that matter, for more than a century thereafter. Thus, under the Judiciary Act, federal courts lack authority to issue them.

C

The principal dissent focuses on conventional legal terrain, like the Judiciary Act of 1789 and our cases on equity. JUSTICE JACKSON, however, chooses a startling line of attack that is tethered neither to these sources nor, frankly, to any doctrine whatsoever. Waving away attention to the limits on judicial power as a "mind-numbingly technical query," *post*, at 3 (dissenting opinion), she offers a vision of

---

[16] Acknowledging these problems, the principal dissent admits that "[t]here may be good reasons not to issue universal injunctions in the typical case." *Post*, at 23 (opinion of SOTOMAYOR, J.). This concession, while welcome, is inconsistent with the position that the universal injunction is a "nothing to see here" extension of the kind of decree obtained on a bill of peace. Neither the principal dissent nor respondents have pointed to any evidence that such decrees presented any of the universal injunction's systemic problems or that they were reserved for situations in which the defendant's conduct was "patently unconstitutional" and risked "exceptional" harm. *Post*, at 22–23. It is precisely because the universal injunction is a new, potent remedy that it poses new, potent risks. Our observation in *Grupo Mexicano* rings true here: "Even when sitting as a court in equity, we have no authority to craft a 'nuclear weapon' of the law." 527 U. S., at 332.

the judicial role that would make even the most ardent defender of judicial supremacy blush.  In her telling, the fundamental role of courts is to "order everyone (including the Executive) to follow the law—full stop."  *Post*, at 2; see also *post*, at 10 ("[T]he function of the courts—both in theory and in practice—necessarily includes announcing what the law requires in . . . suits for the benefit of all who are protected by the Constitution, not merely doling out relief to injured private parties"); see also *post*, at 11, n. 3, 15.  And, she warns, if courts lack the power to "require the Executive to adhere to law universally," *post*, at 15, courts will leave a "gash in the basic tenets of our founding charter that could turn out to be a mortal wound," *post*, at 12.

Rhetoric aside, JUSTICE JACKSON's position is difficult to pin down.  She might be arguing that universal injunctions are appropriate—even required—whenever the defendant is part of the Executive Branch.  See, *e.g.*, *post*, at 3, 10–12, 16–18.  If so, her position goes far beyond the mainstream defense of universal injunctions.   See, *e.g.*, Frost, 93 N. Y. U. L. Rev., at 1069 ("Nationwide injunctions come with significant costs and should never be the default remedy in cases challenging federal executive action").  As best we can tell, though, her argument is more extreme still, because its logic does not depend on the entry of a universal injunction: JUSTICE JACKSON appears to believe that the reasoning behind *any* court order demands "universal adherence," at least where the Executive is concerned.  *Post*, at 2 (dissenting opinion).  In her law-declaring vision of the judicial function, a district court's opinion is not just persuasive, but has the legal force of a judgment.  But see *Haaland* v. *Brackeen*, 599 U. S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury").  Once a single district court deems executive conduct unlawful, it has stated what the law requires.  And the Executive must conform to that view, ceasing its enforcement of the

law against anyone, anywhere.[17]

We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention the Constitution itself. We observe only this: JUSTICE JACKSON decries an imperial Executive while embracing an imperial Judiciary.

No one disputes that the Executive has a duty to follow the law. But the Judiciary does not have unbridled authority to enforce this obligation—in fact, sometimes the law prohibits the Judiciary from doing so. See, *e.g.*, *Marbury* v. *Madison*, 1 Cranch 137 (1803) (concluding that James Madison had violated the law but holding that the Court lacked jurisdiction to issue a writ of mandamus ordering him to follow it). But see *post*, at 15 (JACKSON, J., dissenting) ("If courts do not have the authority to require the Executive to adhere to law universally, . . . compliance with law sometimes becomes a matter of Executive prerogative"). Observing the limits on judicial authority—including, as relevant here, the boundaries of the Judiciary Act of 1789—is required by a judge's oath to follow the law.

JUSTICE JACKSON skips over that part. Because analyzing the governing statute involves boring "legalese," *post*, at 3, she seeks to answer "a far more basic question of enormous practical significance: May a federal court in the

_____

[17] Think about what this position means. If a judge in the District of Alaska holds that a criminal statute is unconstitutional, can the United States prosecute a defendant under that statute in the District of Maryland? Perhaps JUSTICE JACKSON would instinctively say yes; it is hard to imagine anyone saying no. But why, on JUSTICE JACKSON's logic, does it not violate the rule of law for the Executive to initiate a prosecution elsewhere? See *post*, at 2 (dissenting opinion). Among its many problems, JUSTICE JACKSON's view is at odds with our system of divided judicial authority. See, *e.g.*, this Court's Rule 10(a) (identifying conflict in the decisions of the courts of appeals as grounds for granting certiorari). It is also in considerable tension with the reality that district court opinions lack precedential force even vis-à-vis other judges in the same judicial district. See *Camreta* v. *Greene*, 563 U. S. 692, 709, n. 7 (2011).

United States of America order the Executive to follow the law?" *Ibid.* In other words, it is unnecessary to consider whether Congress has constrained the Judiciary; what matters is how the Judiciary may constrain the Executive. JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." *Ibid.* That goes for judges too.

## IV

Finally, the Government must show a likelihood that it will suffer irreparable harm absent a stay. *Nken*, 556 U. S., at 434–435. When a federal court enters a universal injunction against the Government, it "improper[ly] intru[des]" on "a coordinate branch of the Government" and prevents the Government from enforcing its policies against nonparties. *INS* v. *Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U. S. 1301, 1306 (1993) (O'Connor, J., in chambers). That is enough to justify interim relief.

The principal dissent disagrees, insisting that "it strains credulity to treat the Executive Branch as irreparably harmed" by these injunctions, even if they are overly broad. *Post*, at 17 (opinion of SOTOMAYOR, J.); see also Opposition to Application in No. 24A884 (*CASA*), at 16–20. That is so, the principal dissent argues, because the Executive Order is unconstitutional. Thus, "the Executive Branch has no right to enforce [it] against anyone." *Post*, at 15.

The principal dissent's analysis of the Executive Order is premature because the birthright citizenship issue is not before us.[18] And because the birthright citizenship issue is

_____

[18] The dissent worries that the Citizenship Clause challenge will never reach this Court, because if the plaintiffs continue to prevail, they will have no reason to petition for certiorari. And if the Government keeps losing, it will "ha[ve] no incentive to file a petition here . . . because the outcome of such an appeal would be preordained." *Post*, at 42 (opinion of SOTOMAYOR, J.). But at oral argument, the Solicitor General acknowledged that challenges to the Executive Order are pending in multiple

not before us, we take no position on whether the dissent's analysis is right. The dissent is wrong to say, however, that a stay applicant cannot demonstrate irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits. That is not how the *Nken* factors work. See 556 U. S., at 434. For instance, when we are asked to stay an execution on the grounds of a serious legal question, we ask whether the capital defendant is likely to prevail on the merits of the issue before us, not whether he is likely to prevail on the merits of the underlying suit. See, *e.g.*, *Gutierrez* v. *Saenz*, 603 U. S. \_\_\_ (2024) (granting application for a stay based on a question implicating the prisoner's standing to attempt to access DNA testing). The same is true when an applicant seeks a stay in other contexts. See, *e.g.*, *OPM* v. *AFGE*, 604 U. S. \_\_\_ (2025) (granting application for stay because the organizational plaintiffs' allegations were "insufficient to support [their] standing"). So too here.

The question before us is whether the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act. The answer to that question is yes. See *Coleman* v. *Paccar Inc.*, 424 U. S. 1301, 1307–1308 (1976) (Rehnquist, C. J., in chambers); *Trump* v. *International Refugee Assistance Project*, 582 U. S. 571, 578–579 (2017) (*per curiam*); see also *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'" (alteration in original)). And

_____

circuits, Tr. of Oral Arg. 50, and when asked directly "When you lose one of those, do you intend to seek cert?", the Solicitor General responded, "yes, absolutely." *Ibid.* And while the dissent speculates that the Government would disregard an unfavorable opinion from this Court, the Solicitor General represented that the Government will respect both the judgments and the opinions of this Court. See *id.*, at 62–63.

the balance of equities does not counsel against awarding the Government interim relief: Partial stays will cause no harm to respondents because they will remain protected by the preliminary injunctions to the extent necessary and appropriate to afford them complete relief.

\*　　\*　　\*

Some say that the universal injunction "give[s] the Judiciary a powerful tool to check the Executive Branch." *Trump*, 585 U. S., at 720 (THOMAS, J., concurring) (citing S. Amdur & D. Hausman, Nationwide Injunctions and Nationwide Harm, 131 Harv. L. Rev. Forum 49, 51, 54 (2017); S. Malveaux, Class Actions, Civil Rights, and the National Injunction, 131 Harv. L. Rev. Forum, 56, 57, 60–62 (2017)). But federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them. When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too.

The Government's applications to partially stay the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue. The lower courts shall move expeditiously to ensure that, with respect to each plaintiff, the injunctions comport with this rule and otherwise comply with principles of equity. The injunctions are also stayed to the extent that they prohibit executive agencies from developing and issuing public guidance about the Executive's plans to implement the Executive Order. Consistent with the Solicitor General's representation, §2 of the Executive Order shall not take effect until 30 days after the date of this opinion. See Tr. of Oral Arg. 55.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 24A884

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

_____

No. 24A885

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

### ON APPLICATION FOR PARTIAL STAY

_____

No. 24A886

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

### ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

The Court today holds that federal courts may not issue so-called universal injunctions. I agree and join in full. As the Court explains, the Judiciary Act of 1789—the statute that "'authorizes the federal courts to issue equitable remedies'"—does not permit universal injunctions. *Ante,* at 5. It authorizes only those remedies traditionally available in equity, and there is no historical tradition allowing courts to provide "relief that extend[s] beyond the parties." *Ante,* at 5–11. That conclusion is dispositive: As I have previously explained, "[i]f district courts have any authority to issue

universal injunctions," it must come from some specific statutory or constitutional grant. *Trump* v. *Hawaii*, 585 U. S. 667, 713–714 (2018) (concurring opinion). But, the Judiciary Act is the only real possibility, and serious constitutional questions would arise even if Congress purported to one day allow universal injunctions. See *id.*, at 714, n. 2; see also *United States* v. *Texas*, 599 U. S. 670, 693–694 (2023) (GORSUCH, J., concurring in judgment).

I write separately to emphasize the majority's guidance regarding how courts should tailor remedies specific to the parties. Courts must not distort "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). Otherwise, they risk replicating the problems of universal injunctions under the guise of granting complete relief.

As the Court recognizes, the complete-relief principle operates as a ceiling: In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries. See *ante,* at 18 ("Complete relief is not a guarantee— it is the maximum a court can provide"). This limitation follows from both Article III and traditional equitable practice. Because Article III limits courts to resolving specific "Cases" and "Controversies," see U. S. Const., Art. III, §2, it requires that any remedy "be tailored to redress the plaintiff's particular injury." *Gill* v. *Whitford*, 585 U. S. 48, 73 (2018). And, equitable remedies historically operated on a plaintiff-specific basis. *Ante,* at 6–9. Accordingly, any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U. S. 343, 357 (1996).

Courts therefore err insofar as they treat complete relief as a mandate. Some judges have read our precedents to suggest that courts should provide plaintiffs whatever remedy is necessary to give them complete relief. See, *e.g.*,

*Mock* v. *Garland*, 75 F. 4th 563, 587 (CA5 2023) ("[I]njunctions should be crafted to 'provide complete relief to the plaintiffs'"); Z. Siddique, Nationwide Injunctions, 117 Colum. L. Rev. 2095, 2106 (2017) ("[C]ourts . . . tailor their injunctions to provide complete relief to the parties—no less and no more"). But, that reading misunderstands the complete-relief principle.

This principle reflects the equitable "rule that courts generally 'may administer complete relief between the parties.'" *Ante,* at 16 (emphasis deleted). It is an important "aim of the law of remedies . . . to put the plaintiff in her rightful position." S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 466 (2017) (Bray). But, "to say that a court *can* award complete relief is not to say that it *should* do so." *Ante,* at 18. And, in some circumstances, a court *cannot* award complete relief.

As the Court today affirms, any relief must fall within traditional limits on a court's equitable powers. See *ante,* at 5–6 (citing *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319 (1999); *Payne* v. *Hook*, 7 Wall. 425, 430 (1869)). Courts must ask whether the relief plaintiffs seek "was traditionally accorded by courts of equity." *Grupo Mexicano*, 527 U. S., at 319. And, they must ensure that any injunctions comport with both the complete-relief principle and other "principles of equity." *Ante,* at 26. For example, courts may need to weigh considerations such as equity's concern "with justice . . . also for the defendant." Bray 468; see H. McClintock, Handbook of the Principles of Equity 78 (2d ed. 1948). In some cases, traditional equitable limits will require courts and plaintiffs to make do with less than complete relief.

This Court's decision in *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), exemplifies this constraint. Appellant Frothingham sought to "enjoin the execution of a federal appropriation act" on the

grounds that the Act exceeded the Government's authority and that its execution would improperly increase her tax burden. *Id.*, at 479, 486. On a maximalist view of the complete-relief principle, Frothingham would have been entitled to a national injunction had her claim been meritorious. After all, "a prohibition on using *her* tax money for the [statute] would have been wholly ineffectual" in remedying the injury caused by unlawful federal spending, given "the fungibility of money": The Government would still have been free to execute the statute, so long as it labeled the underlying funds as coming from other taxpayers. Bray 431. A court thus would have needed to enjoin all spending under the statute to provide effective relief. But, this Court rejected Frothingham's request for such an injunction as beyond "the preventive powers of a court of equity." 262 U. S., at 487. Among other reasons, it emphasized that an individual taxpayer's "interest in the moneys of the Treasury" was "comparatively minute and indeterminable," and that the petitioner had not suffered any "direct injury" but rather was "suffer[ing] in some indefinite way in common with people generally." *Id.*, at 487–488.*

To be sure, "[w]hat counts as complete relief" can be a difficult question. Bray 467. Many plaintiffs argue that only sweeping relief can redress their injuries. And, I do not dispute that there will be cases requiring an "indivisible remedy" that incidentally benefits third parties, Tr. of Oral Arg., 14–15, such as "[i]njunctions barring public nuisances," *Hawaii*, 585 U. S., at 717 (THOMAS, J., concurring). But, such cases are by far the exception.

An indivisible remedy is appropriate only when it would be "all but impossible" to devise relief that reaches only the plaintiffs. *Ante,* at 16–17, n. 12. Such impossibility is a

_____

*Although courts now treat *Frothingham* primarily as a case about taxpayer standing, its analysis in fact "intertwine[d] concepts of equity, remedies, and the judicial power." Bray 430–433; see *ante,* at 8.

high bar. For example, the Court today readily dispatches with the individual and associational respondents' position that they require a universal injunction, notwithstanding their argument that a "plaintiff-specific injunction" would be difficult to administer and would subject the associations' members to the burden of having "to identify and disclose to the government" their membership. Tr. of Oral Arg. 141–142. As the Court recognizes, "prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff" is all that is required to "give that plaintiff complete relief." *Ante,* at 17. Courts may not use the complete-relief principle to revive the universal injunction.

\* \* \*

For good reason, the Court today puts an end to the "increasingly common" practice of federal courts issuing universal injunctions. *Hawaii*, 585 U. S., at 713 (THOMAS, J., concurring). The Court also makes clear that the complete-relief principle provides a ceiling on federal courts' authority, which must be applied alongside other "principles of equity" and our holding that universal injunctions are impermissible. *Ante,* at 26. Lower courts should carefully heed this Court's guidance and cabin their grants of injunctive relief in light of historical equitable limits. If they cannot do so, this Court will continue to be "dutybound" to intervene. *Hawaii*, 585 U. S., at 721 (THOMAS, J., concurring).

# SUPREME COURT OF THE UNITED STATES

---

No. 24A884

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

---

No. 24A885

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

---

No. 24A886

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court but write separately to note two related issues that are left unresolved and potentially threaten the practical significance of today's decision: the availability of third-party standing and class certification.

First, the Court does not address the weighty issue whether the state plaintiffs have third-party standing to assert the Citizenship Clause claims of their individual residents. See *ante*, at 2, n. 2; see also *ante*, at 26 ("The Government's applications to partially stay the preliminary

injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff *with standing to sue*" (emphasis added)). Ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991). In limited circumstances, however, the Court has permitted a party to assert the rights of a third party. Admittedly, the Court has not pinned down the precise circumstances in which third-party standing is permissible. See *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. 118, 127, n. 3 (2014). And commentators have emphasized the need for "greater doctrinal coherence." C. Bradley & E. Young, Unpacking Third-Party Standing, 131 Yale L. J. 1, 7 (2021) (Bradley & Young).

But at a minimum, we have said that a litigant seeking to assert the legal rights or interests of others must demonstrate ordinary Article III standing for itself *and* answer the additional "threshold question whether [it has] standing to raise the rights of others." *Kowalski* v. *Tesmer*, 543 U. S. 125, 129 (2004). But see *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 398 (2024) (THOMAS, J., concurring). This latter requirement, as we have explained, entails a showing that the litigant has a "close relationship" to the right holder and that there is some "'hindrance'" to the right holder's ability to "protect his own interests." *Kowalski*, 543 U. S., at 130 (quoting *Powers*, 499 U. S., at 411). So long as third-party standing doctrine remains good law, federal courts should take care to apply these limitations conscientiously, including against state plaintiffs. That is especially so in cases such as these, in which the parties claiming third-party standing (*i.e.*, the States) are not directly subject to the challenged policy in the relevant respect and face, at most, collateral injuries. See Bradley & Young 56–60.

Today's decision only underscores the need for rigorous and evenhanded enforcement of third-party-standing limitations. The Court holds today that injunctive relief should generally extend only to the suing plaintiff. See *ante*, at 16–17. That will have the salutary effect of bringing an end to the practice of runaway "universal" injunctions, but it leaves other questions unanswered. Perhaps most important, when a State brings a suit to vindicate the rights of individual residents and then procures injunctive relief, does the injunction bind the defendant with respect to all residents of that State? If so, States will have every incentive to bring third-party suits on behalf of their residents to obtain a broader scope of equitable relief than any individual resident could procure in his own suit. Left unchecked, the practice of reflexive state third-party standing will undermine today's decision as a practical matter.

Second, today's decision will have very little value if district courts award relief to broadly defined classes without following "Rule 23's procedural protections" for class certification. *Ante*, at 14. The class action is a powerful tool, and we have accordingly held that class "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338, 350–351 (2011) (internal quotation marks omitted). These requirements are more than "a mere pleading standard," *id.*, at 350, and a hasty application of Rule 23 of the Federal Rules of Civil Procedure can have drastic consequences, creating "potential unfairness" for absent class members and confusion (and pressure to settle) for defendants. *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 161 (1982). Recognizing these effects, Congress took the exceptional step of authorizing interlocutory review of class certification. See Fed. Rule Civ. Proc. 23(f ).

Putting the kibosh on universal injunctions does nothing to disrupt Rule 23's requirements. Of course, Rule 23 may

permit the certification of nationwide classes in some discrete scenarios. But district courts should not view today's decision as an invitation to certify nationwide classes without scrupulous adherence to the rigors of Rule 23. Otherwise, the universal injunction will return from the grave under the guise of "nationwide class relief," and today's decision will be of little more than minor academic interest.

\*    \*    \*

Lax enforcement of the requirements for third-party standing and class certification would create a potentially significant loophole to today's decision. Federal courts should thus be vigilant against such potential abuses of these tools. I do not understand the Court's decision to reflect any disagreement with these concerns, so I join its decision in full.

# SUPREME COURT OF THE UNITED STATES

———

No. 24A884

———

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

———

No. 24A885

———

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

### ON APPLICATION FOR PARTIAL STAY

———

No. 24A886

———

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

### ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE KAVANAUGH, concurring.

The plaintiffs here sought preliminary injunctions against enforcement of the President's Executive Order on birthright citizenship. The District Courts granted *universal* preliminary injunctions—that is, injunctions prohibiting enforcement of the Executive Order against anyone. Under the Court's holding today, district courts issuing injunctions under the authority afforded by the Judiciary Act of 1789 may award only plaintiff-specific relief. I join the Court's careful and persuasive opinion, which will bring needed clarity to the law of remedies.

To be sure, in the wake of the Court's decision, plaintiffs

who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide. See *ante*, at 13–14; *A. A. R. P.* v. *Trump*, 605 U. S. \_\_\_, \_\_\_ (2025) (*per curiam*) (slip op., at 7); *Califano* v. *Yamasaki*, 442 U. S. 682, 701–703 (1979). And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily "set aside" a new agency rule. 5 U. S. C. §706(2); see, *e.g.*, *West Virginia* v. *EPA,* 577 U. S. 1126 (2016); see also *Corner Post, Inc.* v. *Board of Governors*, 603 U. S. 799, 826–843 (2024) (KAVANAUGH, J., concurring).[1]

But importantly, today's decision will require district courts to follow proper legal procedures when awarding such relief. Most significantly, district courts can no longer award preliminary nationwide or classwide relief except when such relief is legally authorized. And that salutary development will help bring substantially more order and discipline to the ubiquitous preliminary litigation over new federal statutes and executive actions.

I write separately simply to underscore that this case focuses on only one discrete aspect of the preliminary litigation relating to major new federal statutes and executive actions—namely, what *district courts* may do with respect to those new statutes and executive actions in what might be called "the interim before the interim." Although district courts have received much of the attention (and criticism) in debates over the universal-injunction issue, those courts generally do not have the last word when they grant or deny preliminary injunctions. The

_____

[1] In addition, as the Court notes, an injunction granting complete relief to plaintiffs may also, as a practical matter, benefit nonparties. *Ante*, at 15–19.

courts of appeals and this Court can (and regularly do) expeditiously review district court decisions awarding or denying preliminary injunctive relief. The losing party in the district court—the defendant against whom an injunction is granted, or the plaintiff who is denied an injunction—will often go to the court of appeals to seek a temporary stay or injunction. And then the losing party in the court of appeals may promptly come to this Court with an application for a stay or injunction. This Court has therefore often acted as the ultimate decider of the interim legal status of major new federal statutes and executive actions. See, *e.g.*, *Ohio* v. *EPA*, 603 U. S. 279 (2024); *Danco Laboratories, LLC* v. *Alliance for Hippocratic Medicine*, 598 U. S. \_\_\_ (2023); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022) (*per curiam*); *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758 (2021) (*per curiam*); see also *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_–\_\_\_ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2–3).

After today's decision, that order of operations will not change. In justiciable cases, this Court, not the district courts or courts of appeals, will often still be the ultimate decisionmaker as to the interim legal status of major new federal statutes and executive actions—that is, the interim legal status for the several-year period before a final decision on the merits.

## I

The Court's decision today focuses on the "interim before the interim"—the preliminary relief that district courts can award (and courts of appeals can approve) for the generally *weeks-long* interim before this Court can assess and settle the matter for the often *years-long* interim before a final decision on the merits. To appreciate the broader context surrounding today's decision, it is important to understand

this Court's role in preliminary litigation of this sort.

The basic scenario in these kinds of applications to this Court is by now familiar. Congress passes a major new statute, or the Executive Branch issues a major new rule or executive order. The litigation over the legality of the new statute or executive action winds its way through the federal courts. And that litigation may meander on for many months or often years before this Court can issue a final ruling deciding the legality of the new statute or executive action.

In the meantime, various plaintiffs may seek preliminary injunctions, sometimes in many different district courts. And a government defendant against whom a preliminary injunction is granted (or a plaintiff who is denied a preliminary injunction) may seek a temporary stay or injunction in the court of appeals and then in this Court.

That preliminary-injunction litigation—which typically takes place at a rapid-fire pace long before the merits litigation culminates several years down the road—raises a question: What should the *interim* legal status of the significant new federal statute or executive action at issue be during the several-year period before this Court's final ruling on the merits?

That interim-status question is itself immensely important. The issue of whether a major new federal statute or executive action "is enforceable during the several years while the parties wait for a final merits ruling . . . raises a separate question of extraordinary significance to the parties and the American people." *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2–3).

The interim-status issue in turn raises two other critical questions: Should there be a *nationally uniform* answer on the question of whether a major new federal statute or executive action can be legally enforced in the often years-long interim period until this Court reaches a final decision

on the merits? If so, *who decides* what the nationally uniform interim answer is?

*First*, in my view, there often (perhaps not always, but often) should be a nationally uniform answer on whether a *major* new federal statute, rule, or executive order can be enforced throughout the United States during the several-year interim period until its legality is finally decided on the merits.

Consider just a few of the major executive actions that have been the subject of intense preliminary-injunction or other pre-enforcement litigation in the past 10 years or so, under Presidents of both political parties. They range from travel bans to birthright citizenship, from the Clean Power Plan to student loan forgiveness, from the OSHA vaccine mandate to the service of transgender individuals in the military, from Title IX regulations to abortion drugs. And the list goes on. Those executive actions often are highly significant and have widespread effects on many individuals, businesses, governments, and other organizations throughout the United States.

Often, it is not especially workable or sustainable or desirable to have a patchwork scheme, potentially for several years, in which a major new federal statute or executive action of that kind applies to some people or organizations in certain States or regions, but not to others. The national reach of many businesses and government programs, as well as the regular movement of the American people into and out of different States and regions, would make it difficult to sensibly maintain such a scattershot system of federal law.

*Second*, if one agrees that the years-long interim status of a highly significant new federal statute or executive action should often be uniform throughout the United States, who decides what the interim status is?

The answer typically will be this Court, as has been the case both traditionally and recently. This Court's actions

in resolving applications for interim relief help provide clarity and uniformity as to the interim legal status of major new federal statutes, rules, and executive orders. In particular, the Court's disposition of applications for interim relief often will effectively settle, *de jure* or *de facto*, the interim legal status of those statutes or executive actions nationwide.

The decision today will not alter this Court's traditional role in those matters. Going forward, in the wake of a major new federal statute or executive action, different district courts may enter a slew of preliminary rulings on the legality of that statute or executive action. Or alternatively, perhaps a district court (or courts) will grant or deny the functional equivalent of a universal injunction—for example, by granting or denying a preliminary injunction to a putative nationwide class under Rule 23(b)(2), or by preliminarily setting aside or declining to set aside an agency rule under the APA.

No matter how the preliminary-injunction litigation on those kinds of significant matters transpires in the district courts, the courts of appeals in turn will undoubtedly be called upon to promptly grant or deny temporary stays or temporary injunctions in many cases.

And regardless of whether the district courts have issued a series of individual preliminary rulings, or instead have issued one or more broader classwide or set-aside preliminary rulings, the losing parties in the courts of appeals will regularly come to this Court in matters involving major new federal statutes and executive actions.[2]

If there is no classwide or set-aside relief in those kinds of nationally significant matters, then one would expect a flood of decisions from lower courts, after which the losing

--------

[2] By statute, some litigation may start in a court of appeals or three-judge district court and then come directly to this Court.

parties on both sides will probably inundate this Court with applications for stays or injunctions.[3] And in cases where classwide or set-aside relief has been awarded, the losing side in the lower courts will likewise regularly come to this Court if the matter is sufficiently important.

When a stay or injunction application arrives here, this Court should not and cannot hide in the tall grass. When we receive such an application, we must grant or deny.[4] And when we do—that is, when this Court makes a decision on the interim legal status of a major new federal statute or executive action—that decision will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits.

---

[3] That scenario explains why it would not make much sense for this Court to apply different standards to (i) an application for an injunction and (ii) an application for a stay of an injunction. See, *e.g.*, *Tandon* v. *Newsom*, 593 U. S. 61, 64 (2021) (*per curiam*) (applying the usual stay standard to an application for an injunction).

Suppose a district court in Circuit A enjoins a new executive action. And the court of appeals in Circuit A then declines to stay the injunction. Meanwhile, a district court in Circuit B does not enjoin that new executive action, and the court of appeals in Circuit B also declines to enjoin it. Both cases come to this Court on applications for interim relief—one seeking a stay of injunction and one seeking an injunction. It would not be particularly rational to deny a stay and leave the injunction in place in Circuit A, and then to turn around and deny an injunction in Circuit B on account of a purportedly higher standard for this Court to grant injunctions rather than stays. The standards should mesh so that this Court can ensure uniformity without regard to the happenstance of how various courts of appeals and district courts ruled.

[4] To obtain an interim stay or injunction, "an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial" of the application. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); see *Tandon*, 593 U. S., at 64. The Court may also consider (4) the "balance" of "the equities" and "relative harms" to the parties. *Hollingsworth*, 558 U. S., at 190.

II

It is sometimes suggested, however, that this Court should adopt a policy of presumptively denying applications for stays or injunctions—even applications involving significant new federal statutes or executive actions— regardless of which way the various lower courts have ruled. That suggestion is flawed, in my view, because it would often leave an unworkable or intolerable patchwork of federal law in place. And even in cases where there is no patchwork—for example, because an application comes to us with a single nationwide class-action injunction—what if this Court thinks the lower court's decision is wrong? On student loan forgiveness or the Clean Power Plan or mifepristone or the travel bans, for example? Should we have a rule of presumptively denying relief, thereby allowing erroneous injunctions (or erroneous denials of injunctions) of major new statutes and executive actions to remain in place for several years, and thus severely harming the Government and would-be beneficiaries of (or regulated parties under) those new statutes and executive actions? I think not. And this Court's actions over the years reflect that the Court thinks not.

Unless and until this Court grants or denies an application for stay or injunction, tremendous uncertainty may surround the interim legal status of the new federal statute or executive action throughout the country. The statute or executive action may be in effect in some places but not others, for some businesses but not others, for some Americans but not others. That temporary geographic, organizational, and individual variation in federal law might not warrant this Court's intervention in run-of-the-mill cases—which is why it makes sense that this Court denies applications for interim relief when the Court is unlikely to later grant certiorari. See *Does 1–3* v. *Mills*, 595 U. S. \_\_\_, \_\_\_ (2021) (BARRETT, J., concurring in denial of application for injunctive relief). But in cases involving

major new federal statutes or executive actions, uniformity is often essential or at least sensible and prudent. In those kinds of cases, disuniformity—even if only for a few years or less—can be chaotic. And such chaos is not good for the law or the country.

One of this Court's roles, in justiciable cases, is to resolve major legal questions of national importance and ensure uniformity of federal law. So a default policy of off-loading to lower courts the final word on whether to green-light or block major new federal statutes and executive actions for the several-year interim until a final ruling on the merits would seem to amount to an abdication of this Court's proper role.

Some might object that this Court is not well equipped to make those significant decisions—namely, decisions about the interim status of a major new federal statute or executive action—on an expedited basis. But district courts and courts of appeals are likewise not perfectly equipped to make expedited preliminary judgments on important matters of this kind. Yet they have to do so, and so do we. By law, federal courts are open and can receive and review applications for relief 24/7/365. See 28 U. S. C. §452 ("All courts of the United States shall be deemed always open for the purpose of filing proper papers . . . and making motions and orders"). And this Court has procedural tools that can help us make the best possible interim decision in the limited time available—administrative stays, additional briefing, *amicus* briefs, oral argument, certiorari before judgment, and the like. On top of that, this Court has nine Justices, each of whom can (and does) consult and deliberate with the other eight to help the Court determine the best answer, unlike a smaller three-judge court of appeals panel or one-judge district court. And this Court also will have the benefit of the prior decisions in the case at hand from the court of appeals and the district court.

Some might argue that preliminary disputes over the

legality of major new statutes and executive actions can draw this Court into difficult or controversial matters earlier than we might like, as distinct from what happens on our slower-moving merits docket. That is an understandable concern. But when it comes to the interim status of major new federal statutes and executive actions, it is often important for reasons of clarity, stability, and uniformity that this Court be the decider. And Members of the Court have life tenure so that we can make tough calls without fear or favor. As with the merits docket, the Court's role in resolving applications for interim relief is to neutrally referee each matter based on the relevant legal standard. Avoiding controversial or difficult decisions on those applications is neither feasible nor appropriate.

Some might also worry that an early or rushed decision on an application could "lock in" the Court's assessment of the merits and subtly deter the Court from later making a different final decision. But in deciding applications for interim relief involving major new statutes or executive actions, we often have no choice but to make a preliminary assessment of likelihood of success on the merits; after all, in cases of that sort, the other relevant factors (irreparable harm and the equities) are often very weighty on both sides. See *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_–\_\_\_ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 3–4). Moreover, judges strive to make the correct decision based on current information notwithstanding any previous assessment of the merits earlier in the litigation. It is not uncommon to think and decide differently when one knows more. This Court has done so in the past, see *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), and undoubtedly will continue to do so in the future.

To reiterate, this Court should not insert itself into run-of-the-mill preliminary-injunction cases where we are not likely to grant certiorari down the road. But determining the nationally uniform *interim* legal status for several years

of, say, the Clean Power Plan or Title IX regulations or mifepristone rules is a role that the American people appropriately expect this Court—and not only the courts of appeals or district courts—to fulfill.

\*    \*    \*

The volume of preliminary-injunction and other pre-enforcement litigation over new federal laws and executive actions coming to this Court has been growing in recent years. That trend is in part the result of the increasing number of major new executive actions by recent Presidential administrations (of both political parties) that have had difficulty passing significant new legislation through Congress. Meanwhile, applications for stays or injunctions in capital-punishment cases, election disputes, and other time-sensitive matters (including numerous COVID–19-related disputes in the few years beginning in 2020) have also continued to come to this Court on a steady basis, as they traditionally have.

Although the volume of applications has increased, the Court's responsibility for deciding consequential applications for stays or injunctions is not new. See, *e.g.*, *West Virginia* v. *EPA*, 577 U. S. 1126 (2016) (temporarily enjoining Clean Power Plan); *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*) (vacating injunction pending appeal regarding state voter ID law); *Rubin* v. *United States*, 524 U. S. 1301 (1998) (Rehnquist, C. J., in chambers) (denying stay pending certiorari of order enforcing subpoenas to Secret Service agents regarding their observations of the President); *Schlesinger* v. *Holtzman*, 414 U. S. 1321 (1973) (Marshall, J., in chambers) (staying District Court's injunction that had ordered a halt to bombing in Cambodia); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 584, 589 (1952) (after expedited oral argument, affirming District Court's preliminary injunction that proscribed seizure of steel mills by government); cf.

*Rosenberg* v. *United States*, 346 U. S. 273, 283–285 (1953) (vacating stay of execution of the Rosenbergs).

Today's decision on district court injunctions will not affect this Court's vitally important responsibility to resolve applications for stays or injunctions with respect to major new federal statutes and executive actions. Deciding those applications is not a distraction from our job. It is a critical part of our job. With that understanding, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

---

No. 24A884

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

---

No. 24A885

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

### ON APPLICATION FOR PARTIAL STAY

---

No. 24A886

---

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

### ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Children born in the United States and subject to its laws are United States citizens. That has been the legal rule since the founding, and it was the English rule well before then. This Court once attempted to repudiate it, holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that the children of enslaved black Americans were not citizens. To remedy that grievous error, Congress passed in 1866 and the States ratified in 1868 the Fourteenth Amendment's Citizenship Clause, which enshrined birthright citizenship in

the Constitution. There it has remained, accepted and respected by Congress, by the Executive, and by this Court. Until today.

It is now the President who attempts, in an Executive Order (Order or Citizenship Order), to repudiate birthright citizenship. Every court to evaluate the Order has deemed it patently unconstitutional and, for that reason, has enjoined the Federal Government from enforcing it. Undeterred, the Government now asks this Court to grant emergency relief, insisting it will suffer irreparable harm unless it can deprive at least some children born in the United States of citizenship. See Protecting the Meaning and Value of American Citizenship, Exec. Order No. 14160, 90 Fed. Reg. 8849 (2025).

The Government does not ask for complete stays of the injunctions, as it ordinarily does before this Court. Why? The answer is obvious: To get such relief, the Government would have to show that the Order is likely constitutional, an impossible task in light of the Constitution's text, history, this Court's precedents, federal law, and Executive Branch practice. So the Government instead tries its hand at a different game. It asks this Court to hold that, no matter how illegal a law or policy, courts can never simply tell the Executive to stop enforcing it against anyone. Instead, the Government says, it should be able to apply the Citizenship Order (whose legality it does not defend) to everyone except the plaintiffs who filed this lawsuit.

The gamesmanship in this request is apparent and the Government makes no attempt to hide it. Yet, shamefully, this Court plays along. A majority of this Court decides that these applications, of all cases, provide the appropriate occasion to resolve the question of universal injunctions and end the centuries-old practice once and for all. In its rush to do so the Court disregards basic principles of equity as well as the long history of injunctive relief granted to nonparties.

No right is safe in the new legal regime the Court creates. Today, the threat is to birthright citizenship. Tomorrow, a different administration may try to seize firearms from law-abiding citizens or prevent people of certain faiths from gathering to worship. The majority holds that, absent cumbersome class-action litigation, courts cannot completely enjoin even such plainly unlawful policies unless doing so is necessary to afford the formal parties complete relief. That holding renders constitutional guarantees meaningful in name only for any individuals who are not parties to a lawsuit. Because I will not be complicit in so grave an attack on our system of law, I dissent.

I

The majority ignores entirely whether the President's Executive Order is constitutional, instead focusing only on the question whether federal courts have the equitable authority to issue universal injunctions. Yet the Order's patent unlawfulness reveals the gravity of the majority's error and underscores why equity supports universal injunctions as appropriate remedies in this kind of case. As every conceivable source of law confirms, birthright citizenship is the law of the land.

A

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U. S. Const., Amdt. 14, §1. That means what it says. Nestled in the Fourteenth Amendment alongside the Equal Protection Clause, the Citizenship Clause does not discriminate on the basis of race, sex, ethnicity, religion, or, importantly here, parentage. It refers instead to "[a]ll persons born or naturalized in the United States." *Ibid.*

Besides birth, there is only one condition: that one be

"subject to the jurisdiction" of the United States. Yet that condition too leaves no room for ambiguity. To be "subject to the jurisdiction" of the United States means simply to be bound to its authority and its laws. See N. Webster, An American Dictionary of the English Language 732 (C. Goodrich & N. Porter eds. 1865) (defining jurisdiction as the "[p]ower of governing or legislating," or "the power or right of exercising authority"). As the Government would presumably concede, virtually everyone born in the United States and present in its territory is subject to its authority and its laws. After all, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange* v. *McFaddon,* 7 Cranch 116, 136 (1812) (Marshall, C. J., for the Court). Once a citizen of another nation steps onto United States soil, she is (with narrow exception) "amenable to the jurisdiction" of the United States. *Id.*, at 144. That is why "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Plyler* v. *Doe*, 457 U. S. 202, 211, n. 10 (1982).

Few constitutional questions can be answered by resort to the text of the Constitution alone, but this is one. The Fourteenth Amendment guarantees birthright citizenship.

B

Unsurprisingly given the clarity of the Citizenship Clause's text, every other source of interpretation confirms this conclusion. Consider, first, its history. Long before the Fourteenth Amendment, and indeed before the founding, the common-law rule of *jus soli* (literally, right of the soil) governed English citizenship. That rule rendered a person's birthplace determinative of her citizenship status. Thus, "the children of aliens, born . . . in England," generally were "natural-born subjects, and entitled to all the privileges of such." 1 W. Blackstone, Commentaries on the

Laws of England 361–362 (1765); see also H. Broom & G. Denman, Constitutional Law Viewed in Relation to Common Law 31 (2d ed. 1885) (describing *Calvin's Case* (1608), which established that "[e]very one born within the dominions of the King of England . . . is . . . entitled to enjoy all the rights and liberties of an Englishman").

That English common-law rule carried over to the United States after the founding. Shortly after the Constitution's ratification, James Madison observed that "it [was] an established maxim that birth is a criterion of allegiance," *i.e.*, of citizenship. 1 Annals of Cong. 404 (1789). Birth, he explained, could convey citizenship in two ways: either through "place" (under the "right of the soil" principle) or through "parentage" (as for one born to United States citizens). *Ibid.* "[B]ut, in general," Madison explained, "place is the most certain criterion" and "it is what applies in the United States." *Ibid.* Mere decades later, Justice Story wrote that "[n]othing is better settled . . . than the doctrine that the children even of aliens born in a country . . . are subjects by birth." *Inglis* v. *Trustees of Sailor's Snug Harbour in City of New York*, 3 Pet. 99, 164 (1830). Well before the Fourteenth Amendment, then, it was the undisputed "law of the United States [that] every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen." *Lynch* v. *Clarke*, 1 Sand. Ch. 583, 663 (N. Y. Ch. 1844).

Though the law was clear, the Nation did not always live up to its promise. Infamously, this Court departed from the birthright citizenship principle in *Dred Scott*, 19 How. 393, holding that the children of enslaved black Americans "are not included, and were not intended to be included, under the word 'citizens' in the Constitution." *Id.*, at 404. Following the Civil War, the Reconstruction Congress corrected that grave error. Section 1 of the Civil Rights Act of 1866, 14 Stat. 27, declared that "all persons born in the United

States and not subject to any foreign power" would be "citizens of the United States." The Fourteenth Amendment's guarantee of birthright citizenship followed two years later.

The lawmakers who ratified the Fourteenth Amendment understood that it would extend citizenship to all children born here, regardless of parental citizenship. Indeed, some objected to its passage on those grounds, complaining that it would permanently extend citizenship to immigrants who "invade [state] borders" and "settle as trespassers." Cong. Globe, 39th Cong., 1st Sess., 2891 (1866). Proponents agreed, if not with the anti-immigrant sentiment, that the Clause would extend citizenship to the children of immigrants. For example, Senator Conness of California (one of the Amendment's lead supporters) confirmed on the floor "that the children born here of Mongolian parents shall be declared by the Constitution of the United States to be entitled to civil rights and to equal protection before the law." *Id.*, at 2892. "We have declared that by law" in the Civil Rights Act, he explained, and "now it is proposed to incorporate the same provision in the fundamental instrument of the nation." *Id.*, at 2891. Not one Senator disagreed with this understanding of the Clause.

In the end, "[t]he Citizenship Clause was no legal innovation." J. Ho, Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment, 9 Green Bag 2d 367, 369 (2006); see also *id.*, at 368 ("Birthright citizenship is guaranteed by the Fourteenth Amendment. That birthright is protected no less for children of undocumented persons than for descendants of *Mayflower* passengers"). "It simply restored the longstanding English common law doctrine of *jus soli*" abrogated by *Dred Scott*. Ho, 9 Green Bag 2d, at 369; see also M. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L. J. 405, 472 (2020) (The "central purpose" of the Citizenship Clause "was, of course, to overrule *Dred Scott*").

## C

Following the ratification of the Fourteenth Amendment, this Court confirmed the Amendment's plain meaning in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898). At issue was the citizenship of Wong Kim Ark, a young California resident born in San Francisco to Chinese immigrant parents. *Id.*, at 652. When Wong returned to California from a trip to China, a custom's collector denied him entry on the sole ground that he was not a citizen of the United States. *Id.*, at 653.

This Court held that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory." *Id.*, at 693. As the President does today, the Government in *Wong Kim Ark* rested its case on the Clause's sole qualifier. Wong was not subject to the jurisdiction of the United States, the Government claimed, because at birth his parents were aliens in the United States who were "subjects of the emperor of China," thus making Wong a subject of the emperor of China as well. *Id.*, at 652–653. This Court squarely rejected that attempt to limit the Citizenship Clause's reach. Instead, it held, the "'subject to the jurisdiction'" qualifier excludes only "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State," *id.*, at 682, "with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes," *id.*, at 693.[1]

---

[1] The first two exceptions "ha[d] already been shown, by the law of England and by our own law, from the time of the first settlement of the English colonies in America, [to be] recognized exceptions to the fundamental rule of citizenship by birth within the country." *Wong Kim Ark*, 169 U. S., at 682. The additional exception for certain children born to Indian tribe members reflected the country's historical understanding that Indian tribes were "*quasi* foreign nations" within the physical boundaries of the United States. See Cong. Globe, 39th Cong., 1st Sess.,

That holding conclusively settled any remaining dispute over the Citizenship Clause's meaning. Since then, all three branches of Government have unflinchingly adhered to it.

This Court, for one, has repeatedly reaffirmed *Wong Kim Ark*'s holding. Notwithstanding legislation purporting to render Japanese persons "ineligible" for citizenship, we held in *Morrison* v. *California*, 291 U. S. 82 (1934), that a child with Japanese parents "is a citizen of the United States if he was born within the United States." *Id.*, at 85. The Court recognized the same rule even during World War II, when individuals of Japanese ancestry were subject to curfew and exclusion orders. See *Hirabayashi* v. *United States*, 320 U. S. 81, 96–97 (1943). So too has the Court recognized that the child of parents unlawfully present in the United States "is, of course, an American citizen by birth." *United States ex rel. Hintopoulos* v. *Shaughnessy*, 353 U. S. 72, 73 (1957). The same is true of children whose parents gained admission into the United States by unlawful means. See, *e.g.*, *INS* v. *Errico*, 385 U. S. 214, 215–216 (1966); *INS* v. *Rios-Pineda*, 471 U. S. 444, 446 (1985).

Congress, for its part, has also reaffirmed the principles of birthright citizenship by enshrining it in a federal statute. Section 201 of the Nationality Act of 1940 provides that all those "born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth." 8 U. S. C. §1401(a); see also *Taggart* v. *Lorenzen*, 587 U. S. 554, 560 (2019) (recognizing

--------

2890 (1866). Treaties between many tribes and the Federal Government, at the time, ensured that it was the tribe, and not the United States Government, that had "prescriptive and law enforcement authority" over tribal members. M. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L. J. 405, 443–444 (2020); see *id.*, at 442–444. Congress eventually extended birthright citizenship to tribal members born in the United States in 1924. See Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253, 8 U. S. C. §1401(b). These exceptions are not at issue in these cases.

"longstanding interpretive principle" that if statutory term "'is "obviously transplanted from another legal source," it "brings the old soil with it"'").

For at least the last century, the Executive Branch has adhered to the same principle. When Congress proposed to reaffirm birthright citizenship in the 1940 Nationality Act, cabinet officials described it as "a statement of the common-law rule, which has been in the United States from the beginning of its existence." House Committee on Immigration and Naturalization, Nationality Laws of the United States, 76th Cong., 1st Sess., 7 (Comm. Print 1939). Indeed, the Government concedes even now that the Executive Branch has recognized the vitality of birthright citizenship "at least back to World War II, if not earlier." App. to Opposition to Application in No. 24A886, p. 323a. That explains, among other things, why the Social Security Administration and the Department of State have long accepted proof of one's birthplace as proof of citizenship. See 44 Fed. Reg. 10369, 10371 (1979); 20 CFR §§422.107(d), 422.103(c)(2) (2024); 22 CFR §§51.40, 51.42 (2024).

Some decades ago, the Office of Legal Counsel was asked to respond to a House bill that would have denied birthright citizenship to "'children born in the United States to parents who are not citizens or permanent resident aliens.'" 19 Op. OLC 340, 341 (1995). The answer well summed up the state of the law: This "office grapples with many difficult and close issues of constitutional law. The lawfulness of this bill is not among them. This legislation is unquestionably unconstitutional." *Ibid.*

## II

### A

Undeterred by the Constitution, history, Supreme Court precedent, federal law, and longstanding Executive Branch practice, President Donald J. Trump issued Executive Order No. 14160 on the day of his inauguration that purported

to redefine American citizenship. The Order declares that United States citizenship does not extend to persons who are born to a mother unlawfully present in the United States, or lawfully present on a temporary basis, and a father who is neither a citizen nor lawful permanent resident. *Ibid.* It further prohibits federal agencies from issuing citizenship documentation to such persons or accepting state documentation to that effect, and it directs a slew of federal officials to conform agency regulations to the Order. *Id.*, at 8449–8450. The prohibition, according to the Order, applies "only to persons who are born within the United States after 30 days from the date of th[e] order." *Id.*, at 8449.

B

Shortly after the President issued the Citizenship Order, several groups of plaintiffs (together, respondents) challenged the Order in Federal District Courts in Maryland, Massachusetts, and Washington. Respondents include: a group of pregnant women[2] whose children will not be United States citizens under the terms of the Citizenship Order; two immigrants-rights organizations with thousands of members across the country who are likely to give birth to children who would also be denied citizenship under the Order; and 22 States, the District of Columbia, and the city of San Francisco. In their respective suits, respondents asserted that the Citizenship Order violates the Fourteenth Amendment and §1401(a).

Respondents also sought a preliminary injunction barring enforcement of the Citizenship Order during the pendency of the litigation. If allowed to go into effect, they said, the policy would inflict irreparable harm on their children

_____

[2] Two of these women seek to represent a class of pregnant women and children residing in Washington State, who are affected by the Citizenship Order. See Complaint in No. 2:25–cv–00127 (WD Wash., Feb. 4, 2025), ECF Doc. 106. The District Court has yet to rule on the certification of that putative class.

(and their members' children) by denying them "enjoyment of the full privileges, rights, and benefits that come with U. S. citizenship," and rendering them vulnerable to unlawful deportation before the Courts could adjudicate their constitutional claim. Complaint in No. 8:25–cv–00201 (D Md., Jan. 21, 2025), p. 6, ¶12; see also Complaint in No. 2:25–cv–00127 (WD Wash., Feb. 4, 2025), ECF Doc. 106, pp. 33–36, ¶¶120–139 (Washington Complaint).

As for the States, they attested that enforcement of the Citizenship Order would cost them millions of dollars in federal funding and impose significant administrative burdens. The States "administer numerous programs for the benefit of their residents, including for newborns and young children, some of whom are wards of the plaintiff States who are entitled to care by statute." *Id.*, at 23, ¶79. Those social welfare programs include ones provided for by state law, as well as ones established by federal law, such as Medicaid and the Children's Health Insurance Program: Several of them "are funded in part by federal dollars, with federal funding frequently tied to the citizenship and immigration status of the individuals served." *Ibid.* By stripping some children within the States of their citizenship, the Order would reduce the States' federal funding, "forc[ing the States] to bear significantly increased costs to operate and fund programs that ensure the health and well-being of their residents." *Id.*, at 6, ¶8, 4–5, ¶6; see also Opposition to Application in No. 24A886 (New Jersey), pp. 9–11; Complaint in No. 1:25–cv–10139 (D Mass., Jan. 21, 2025), pp. 23–42, ¶¶121–201. Relatedly, because the States must verify the citizenship status of the individuals they serve, the States alleged that the Citizenship Order would force them to expend significant sums to "modif[y] their . . . operational structures and administration" to account for the changes in citizenship. Washington Complaint 6, ¶8; see also Opposition to Application in No. 24A886 (New Jersey), at 9–11.

All three District Courts preliminarily enjoined enforcement of the Citizenship Order. Each court determined that the Citizenship Order was likely unlawful, that respondents were likely to face irreparable harm without an injunction, and that the equities and public interest cut decisively in respondents' favor. See 763 F. Supp. 3d 723, 727, 744–745 (Md. 2025); 765 F. Supp. 3d 1142, 1152–1153 (WD Wash. 2025); *Doe* v. *Trump*, 766 F. Supp. 3d 266, 274, 285–287 (Mass. 2025).

The District Courts further determined that only injunctions blocking the Citizenship Order's enforcement nationwide would completely redress respondents' injuries. For the organizational plaintiffs, the Maryland District Court explained that those plaintiffs have "'over 680,000 members . . . who reside in all 50 U.S. states'" and "hundreds of them expect to give birth soon." 763 F. Supp. 3d, at 746. The Washington District Court found that "a geographically limited injunction would be ineffective" for the state plaintiffs "as it would not completely relieve [the States] of the Order's financial burden(s)." 765 F. Supp. 3d, at 1153. For one thing, that court explained, the constant flow of people moving in and out of various States meant some children born to noncitizen parents in a nonplaintiff State would later reside in a plaintiff State. Once there, those children (under state law) would be eligible for state benefits. Yet due to the Citizenship Order, the plaintiff States would no longer receive federal funding to support those benefits. In addition, the plaintiff States would have to create an entirely new administrative and recordkeeping system to accommodate children who were not citizens under the Order and born in a nonplaintiff State. So if the District Court allowed birthright citizenship to continue for children born in the plaintiff States, but not in any other State, that would not completely redress the States' financial injury. *Ibid.*

For identical reasons, the Massachusetts District Court

also found that the state plaintiffs' injuries could be redressed only by a universal injunction. See 766 F. Supp. 3d, at 288 ("The harms [the States] have established stem from the [Order's] impact on the citizenship status—and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction").

The Government filed motions to stay the injunctions in three separate Courts of Appeals. Nowhere did the Government contest the District Courts' uniform holdings that the Citizenship Order likely violated the Constitution. Instead, it challenged only the scope of the ordered relief, arguing that the injunctions should be narrowed to block the Order's enforcement against only the individual persons named in the complaints.

All three appellate courts denied the Government's request and left the preliminary injunctions intact. See 131 F. 4th 27 (CA1 2025); 2025 WL 654902 (CA4, Feb. 28, 2025); 2025 WL 553485 (CA9, Feb. 19, 2025). The Fourth Circuit, which reviewed the preliminary injunction issued to the organizational plaintiffs, concluded that "[t]he district court . . . carefully explained why an injunction limited to the parties—including organizations with hundreds of thousands of members nationwide—would be unworkable in practice and thus fail to provide complete relie[f] to the plaintiffs." 2025 WL 654902, *1. The First and Ninth Circuits left undisturbed the Massachusetts and Washington District Courts' respective determinations that only universal injunctions would fully redress the States' injuries. See 131 F. 4th, 42–43; 2025 WL 553485, *1.

On March 13, the Government filed emergency applications with this Court requesting partial stays of the three preliminary injunctions of the Citizenship Order. The Government renews its contention that the injunctions must be narrowed to benefit only formal parties in these cases.

### III

In partially granting the Government's remarkable request, the Court distorts well-established equitable principles several times over. A stay, this Court has said, "'is not a matter of right,'" but rather "'an exercise of judicial discretion.'" *Nken* v. *Holder*, 556 U. S. 418, 433 (2009). For centuries, courts have "close[d] the doors" of equity to those "tainted with inequitableness or bad faith relative to the matter in which [they] seek relief." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806, 814 (1945). Yet the majority throws the doors of equity open to the Government in a case where it seeks to undo a fundamental and clearly established constitutional right. The Citizenship Order's patent unlawfulness is reason enough to deny the Government's applications.

The Government also falls well short of satisfying its burden to show that it will likely suffer irreparable harm absent a stay and that it will likely succeed on the merits of its challenge to the scope of the injunctions. *Nken*, 556 U. S., at 434–435. The Executive Branch has respected birthright citizenship for well over a century, and it advances no plausible reason why maintaining the status quo while the litigation proceeds would cause it irrevocable harm. Nor could it, for the Constitution and federal law prohibit the enforcement of the Citizenship Order.

For all that, moreover, the Government is not even correct on the merits of universal injunctions. To the contrary, universal injunctions are consistent with long-established principles of equity, once respected by this Court. What is more, these cases do not even squarely present the legality of universal injunctions. That is because, even if the majority were right that injunctions can only offer "complete relief *to the plaintiffs before the court*," *ante,* at 17, each of the lower courts here correctly determined that the nationwide relief they issued was necessary to remedy respondents' in-

juries completely. So even ignoring the traditional stay factors and accepting the majority's view of the merits, there is no reason to grant relief in these cases.

## A

It is a bedrock principle that parties who request a stay must show they will likely suffer irreparable harm absent such relief. Indeed, "[t]he authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review." *Nken*, 556 U. S., at 432 (quoting *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 9 (1942)). Thus, an apparent likelihood of success on the merits never suffices on its own to justify this Court's intervention: Our emergency docket is not a mechanism for an expedited appeal. Accordingly, "this Court can avoid delving into the merits" "[i]f the [applicant does not] demonstrat[e] an irreparable injury." *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 3); contra, *ante*, at 8–11 (KAVANAUGH, J., concurring).

What grave harm does the Executive face that prompts a majority of this Court to grant it relief? The answer, the Government says, is the inability to enforce the Citizenship Order against nonparties. For the majority, that answer suffices. See *ante,* at 24 ("When a federal court enters a universal injunction against the Government, it 'improper[ly] intrude[s]' on 'a coordinate branch of the Government' and prevents the Government from enforcing its policies against nonparties").

The problem, however, is that the Executive Branch has no right to enforce the Citizenship Order against anyone. As the Executive itself once put it, the Order is "unquestionably unconstitutional." *Supra*, at 9. It defies logic to say that maintaining a centuries-long status quo for a few months longer will irreparably injure the Government. See *Starbucks Corp.* v. *McKinney*, 602 U. S. 339, 345–346

(2024) (The "purpose" of equitable relief "'is merely to preserve the relative positions of the parties until a trial on the merits can be held'").  The President's "mandate . . . to exercise his executive power," *Myers* v. *United States*, 272 U. S. 52, 123 (1926), in any event, does not permit him to rewrite the Constitution or statutory provisions at a whim. By forging ahead and granting relief to the Government anyway, this Court endorses the radical proposition that the President is harmed, irreparably, whenever he cannot do something he wants to do, even if what he wants to do is break the law.

The majority claims that it can sidestep "analysis of the Executive Order" altogether because (in its view) every overbroad injunction necessarily causes irreparable harm sufficient to warrant emergency intervention. *Ante,* at 24. Yet where a purportedly overbroad injunction orders the Government to do only what this Court has expressly held it is required to do, it is hard to see how it could cause any harm. At oral argument, the Government conceded it was bound to follow this Court's precedent.  See Tr. of Oral Arg. 62–63.  This Court's precedent establishes beyond a shade of doubt that the Executive Order is unconstitutional.  See *supra*, at 3–9.  Thus, by enjoining the Government from violating settled law, the District Courts' orders do not cause the Government any harm.

The majority's contrary position is self-refuting.  Suppose an executive order barred women from receiving unemployment benefits or black citizens from voting.  Is the Government irreparably harmed, and entitled to emergency relief, by a district court order universally enjoining such policies? The majority, apparently, would say yes.

Nothing in this Court's precedents supports that result. It turns one of the "'most critical' factors we must consider in deciding whether to grant a stay" into a box-checking exercise whenever the relevant enjoined action is an executive one. *Trump* v. *International Refugee Assistance Project*, 582

U. S. 571, 584 (2017) (THOMAS, J., concurring in part and dissenting in part). Even accepting that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers), that democratic consideration cuts against the Government in these cases. Through the ratification of the Fourteenth Amendment, Congress and the States constitutionalized birthright citizenship. Congress also codified birthright citizenship in §1401(a). It is thus the Citizenship Order, not the District Courts' injunctions, that prevents the "'effectuat[ion]'" of a constitutional amendment and repeals a "'statut[e] enacted by representatives of [the American] people.'" *Id.*, at 1303.

Simply put, it strains credulity to treat the Executive Branch as irreparably harmed by injunctions that direct it to continue following settled law. "All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States* v. *Lee*, 106 U. S. 196, 220 (1882); but see *Trump* v. *United States*, 603 U. S. 593 (2024). The injunctions do no more harm to the Executive than the Constitution and federal law do.

## B

A majority of this Court nonetheless rushes to address the merits of the Government's applications, holding that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." *Ante,* at 1–2. A majority that has repeatedly pledged its fealty to "history and tradition" thus eliminates an equitable power firmly grounded in centuries of equitable principles and practice. By stripping all federal courts, including itself, of that power, the Court kneecaps the Judiciary's authority to stop the Executive from enforcing even the most unconstitutional policies. That runs directly counter to the point of equity: empowering courts to do complete justice, including

through flexible remedies that have historically benefited parties and nonparties alike.

1

A brief recounting of equity's history demonstrates the majority's grave error. The American legal system grew out of English law, which had two primary judicial institutions: the common-law courts and equity courts. Equity courts arose because of the inflexibility of the common-law system; their purpose was to look beyond formal writs and provide remedies where the common law gave inadequate relief. In Blackstone's words, equity was meant "to give remedy in cases where none before was administered." 3 Commentaries on the Laws of England, at 50.

Adaptability has always been a hallmark of equity, especially with regard to the scope of its remedies. While common-law courts were "compelled to limit their inquiry to the very parties in the litigation before them," equity courts could "adjust the rights of all, however numerous," and "adapt their decrees to all the varieties of circumstances, which may arise, and adjust them to all the peculiar rights of all the parties in interest." J. Story, Commentaries on Equity Jurisprudence §28, pp. 27–28 (2d ed. 1839). After all, equity's "constant aim" was "to do complete justice." J. Story, Commentaries on Equity Pleadings §72, p. 74 (2d ed. 1840). Accordingly, equity courts could "decid[e] upon and settl[e] the rights of all persons interested in the subject-matter of the suit, so that the performance of the decree of the Court may be perfectly safe to those, who are compelled to obey it, and also, that future litigation may be prevented." *Ibid.*

For equity courts, injunctions were "manifestly indispensable for the purposes of social justice in a great variety of cases." Story, Commentaries on Equity Jurisprudence §959a, at 227. Unlike this Court, then, those courts "constantly decline[d] to lay down any rule which shall limit

their power and discretion as to the particular cases, in which such injunctions shall be granted, or withheld." *Ibid.* Justice Story underscored the "wisdom in this course": Equity courts needed flexibility to craft injunctions for particular cases, as it was "impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs." *Ibid.*

In their pursuit of complete justice, equity courts could award injunctive and other equitable relief to parties and nonparties alike. For centuries, they did so through what was known as "bills of peace." If a plaintiff or group of plaintiffs filed such a bill, an English court could use a single case to settle disputes affecting whole communities, for "the inherent jurisdiction of equity" included the power "to interfere for the prevention of a multiplicity of suits." 1 J. Pomeroy, Equity Jurisprudence §260, p. 278 (1881). Bills of peace issued in cases "'where the parties [were] very numerous, and the court perceive[d] that it [would] be almost impossible to bring them all before the court; or where the question is of general interest, and a few may sue for the benefit of the whole.'" *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 832 (1999) (quoting *West* v. *Randall*, 29 F. Cas. 718, 722 (No. 17,424) (CC RI 1820) (Story, J.)). In such cases, a court could "grant [equitable relief] without making other persons parties," instead considering them "quasi parties to the record, at least for the purpose of taking the benefit of the decree, and of entitling themselves to other equitable relief, if their rights [were] jeopard[iz]ed." *Id.*, at 723.

Early American courts embraced bills of peace and extended their logic to cases "which [were] not technically 'bills of peace,' but '[were] analogous to,' or 'within the principle' of such bills." 1 Pomeroy, Equity Jurisprudence §269, at 293. One example was taxpayer suits, which allowed courts to enjoin universally the enforcement of a challenged tax. Sometimes, such suits were filed "by any number of taxpayers joined as co-plaintiffs, or by one taxpayer suing

on behalf of himself and all others similarly situated." *Id*.,
at 277. But taxpayer suits were not always representative
in nature: Even "a single taxpayer suing on his own ac-
count," if victorious, could enjoin the collection of a tax
against anyone. *Ibid.* Individual plaintiffs, moreover, could
secure an order "to set aside and annul any and every illegal
public official action . . . whereby a debt . . . would be un-
lawfully created." *Ibid.* By allowing "complete and final
relief [to] be given to an entire community by means of one
judicial decree," American courts (like their English coun-
terparts) spared nonparties and themselves from the bur-
den of "an indefinite amount of separate litigation." *Id*., at
278.

Federal courts have also exercised equitable authority to
enjoin universally federal and state laws for more than a
century. For instance, before deciding the constitutionality
of a new federal law in *Lewis Publishing Co.* v. *Morgan*, 229
U. S. 288 (1913), this Court entered an order blocking the
law's enforcement against parties and nonparties. See M.
Sohoni, The Lost History of the "Universal" Injunction, 133
Harv. L. Rev. 920, 944–946 (2020). In *Lewis*, two newspa-
per publishers challenged as unconstitutional a federal law
requiring publishers to file with the Postmaster General
twice-yearly disclosures about their editorial board mem-
bership, corporate ownership, and subscribership. Sohoni,
133 Harv. L. Rev., at 944. After the District Court upheld
the law and authorized a direct appeal to the Supreme
Court, one of the publishers moved for a restraining order.
The proposed order sought relief not only for the publisher
who filed it, but asked the Court to "'restrai[n]'" the Post-
master General and other federal officials from enforcing
the law against "'*appellant and other newspaper publish-
ers.*'" *Id*., at 946. This Court readily agreed, see *Journal of
Commerce and Commercial Bulletin* v. *Burleson*, 229 U. S.
600, 601 (1913) (*per curiam*), even as it would have sufficed

for the movant publishers' sake to enjoin the Act's enforcement against them alone pending their appeal.

In *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), too, this Court affirmed a universal injunction of Oregon's compulsory public schooling law. See Sohoni, 133 Harv. L. Rev., at 959–962. Two private school owners challenged that law in a suit against the Governor of Oregon and other state officials. "The plaintiffs did not sue on behalf of a represented group or class; they sued for themselves, alleging that the law was an unconstitutional interference with their property rights." *Id.*, at 959. Yet a three-judge federal court awarded them a universal injunction. See *id.*, at 960–961. This Court, in affirming that relief, twice described it as "appropriate." *Pierce*, 268 U. S., at 530, 533. The Court understood that the injunction it affirmed would provide relief to nonparties, commenting that such relief was necessary because enforcing the Act would result not only in the "destruction of appellees' primary schools," but would also destroy "perhaps all other private primary schools for normal children within the State of Oregon." *Id.*, at 534.

Cases like *Lewis* and *Pierce* were not outliers. Throughout the early 20th century, federal courts granted universal injunctions even when a narrower remedy would have sufficed to redress the parties' injuries. See, *e.g.*, *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943) (affirming an injunction that shielded the plaintiff class of Jehovah's Witnesses, and any other children with religious scruples, from complying with a state law requiring children to salute the American flag); see also Sohoni, 133 Harv. L. Rev., at 943–993 (collecting cases). It is certainly true that federal courts have granted more universal injunctions of federal laws in recent decades. But the issuance of broad equitable relief intended to benefit parties and nonparties has deep roots in equity's history and in this Court's precedents.

The universal injunctions of the Citizenship Order fit

firmly within that tradition. The right to birthright citizenship is "clear," the Citizenship Order is an "'illegal act,'" and without the "'preventive process of injunction,'" the right will be "'irreparably injured.'" *Arthur* v. *Oakes*, 63 F. 310, 328 (CA7 1894) (Harlan, J.) (describing standard for when an injunction should issue). It would be "'almost impossible,'" moreover, "'to bring all [affected individuals] before the court,'" *Ortiz*, 527 U. S., at 832, justifying the use of one suit to settle the issue of the Citizenship Order's constitutionality for all affected persons. See 1 Pomeroy, Equity Jurisprudence §260, at 450–451. Complete justice, the "constant aim" of equity, Story, Commentaries on Equity Pleadings §72, at 74, demands a universal injunction: "'the only remedy which the law allows to prevent the commission'" of a flagrantly illegal policy. *Arthur*, 63 F., at 328. The District Courts, by granting such relief, appropriately "settle[d] the rights of all persons interested in the subject-matter" of these suits, binding the Government so as to prevent needless "future litigation." Story, Commentaries on Equity Pleadings §72, at 74.

Of course, as a matter of equitable discretion, courts may often have weighty reasons not to award universal relief. Among other things, universal injunctions can prevent different district and appellate courts from considering the same issues in parallel, forestalling the legal dialogue (or "percolation") the federal system uses to answer difficult questions correctly. Not so here, however, because the Citizenship Order is patently unconstitutional under settled law and a variety of district and appellate courts have reviewed the issue. So too can universal injunctions encourage forum shopping, by allowing preferred district judges in a venue picked by one plaintiff to enjoin governmental policies nationwide. They also operate asymmetrically against the Government, giving plaintiffs a litigation advantage: To halt Government action everywhere, a plaintiff must win

only one universal injunction across many potential lawsuits. Yet this is not a scenario where granting universal relief will encourage forum shopping or give plaintiffs the upper hand. Quite the opposite: By awarding universal relief below, the District Courts just ordered the Government to do everywhere what any reasonable jurist would order the Government to do anywhere.

There may be good reasons not to issue universal injunctions in the typical case, when the merits are open to reasonable disagreement and there is no claim of extraordinary and imminent irreparable harm.[3]  See Story, Commentaries on Equity Jurisprudence §959a, at 227 ("[Injunctive relief] ought . . . to be guarded with extreme caution, and applied only in very clear cases"); cf. *ante,* at 13 ( "[The] use [of bills of peace] was confined to limited circumstances"). The universal injunctions in these cases, however, are more than appropriate. These injunctions, after all, protect newborns from the exceptional, irreparable harm associated with losing a foundational constitutional right and its immediate benefits. They thus honor the most basic value of our constitutional system: They keep the Government within the bounds of law. *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803).

2

The majority's contrary reasoning falls flat. The majority starts with the Judiciary Act of 1789, which gives federal courts jurisdiction over "all suits . . . in equity." §11, 1 Stat. 78. In the majority's telling, universal injunctions are inconsistent with equity jurisdiction because they are not "sufficiently 'analogous' to the relief '"exercised by the High

———————

[3] These prudential considerations, however, have nothing to do with whether universal injunctions are consistent with historical equitable principles and practice. Contra *ante,* at 21, n. 16; but cf. *ante,* at 21 ("[T]he policy pros and cons [of universal injunctions] are beside the point").

Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act.""" *Ante,* at 6 (quoting *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–319 (1999)). In reaching that ahistorical result, the Court claims that the English Chancellor's remedies were "typically" party specific, and emphasizes that party-specific principles have permeated this Court's understanding of equity. *Ante,* at 6–9.

The majority's argument stumbles out the gate. As the majority must itself concede, injunctions issued by English courts of equity were "typically," but not always, party specific. *Ante,* at 7. After all, bills of peace, for centuries, allowed English courts to adjudicate the rights of parties not before it, and to award remedies intended to benefit entire affected communities. Taxpayer suits, too, could lead to a complete injunction of a tax, even when only a single plaintiff filed suit.

The majority seeks to distinguish bills of peace from universal injunctions by urging that the former (but not the latter) typically applied to small and cohesive groups and were representative in nature. See *ante,* at 13. Yet those are distinctions without a difference. Equity courts had the flexibility to "adapt their decrees to all the varieties of circumstances, which may arise, and adjust them to all the peculiar rights of all the parties in interest." Story, Commentaries on Equity Jurisprudence §28, at 28. There is no equitable principle that caps the number of parties in interest. Indeed, in taxpayer suits, a single plaintiff could get the relief of "annul[ling] any and every kind of tax or assessment" that applied to an entire "county, town, or city."

1 Pomeroy, Equity Jurisprudence §260, at 277.[4] "[T]he inherent jurisdiction of equity to interfere for the prevention of a multiplicity of suits," moreover, is what empowered common law courts to issue bills of peace. *Id.*, at 450–451 (4th ed. 1918). That is why early American courts understood taxpayer suits, in which even a "single taxpayer suing on his own account" and not on behalf of others could secure a total injunction, to be a natural extension of a bill of peace. *Id.*, at 277 (1881).[5]

It is also unclear why "'cohesive[ness]'" or "representative[ness]" would preclude even those universal injunctions that, like here, benefit a discrete and cohesive group. *Ante,* at 13. The Citizenship Order itself applies only to a subset group of newborn children: that is, children born to a mother unlawfully or temporarily present, and a father who

_____

[4] *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), which addressed a taxpayer's standing to challenge a federal appropriation, did not consider how broadly a court could enjoin Government action and is therefore not to the contrary. *Id.*, at 488; contra, *ante,* at 15.

[5] The majority asserts that taxpayer suits are an "inadequate historical analogy" for a universal injunction, *ante,* at 14, but cannot dispute their essential similarity: By providing relief to an entire affected community, both do more than merely redress a plaintiff's injuries. Instead, the majority says that single-plaintiff, nonrepresentative taxpayer suits cannot be proper "historical" analogues because they trace only back to the "mid-19th century." See *ibid.* Yet the same is true of plaintiff-protective injunctions against federal and state government officials, an equitable remedy the majority embraces by reference to "a long line of cases authorizing suits against State officials in certain circumstances" that range from the cusp of the mid-19th century to the late mid-19th century. *Ante,* at 11, n. 9. In any event, early American courts deemed taxpayer suits "'analogous to,' [and] 'within the principle of' . . . bills [of peace],'" 1 Pomeroy, Equity Jurisprudence §269, at 293, which trace back to the equitable practice of the English Chancery Court, *ante,* at 12. Nor is it clear why it matters that individual taxpayer suits occurred in state courts, or that those courts did not always award the broad injunctions available to them. Contra, *ante,* at 15. The relevant question is simply whether a court of equity could award injunctive relief to nonparties. The answer to that question is, obviously, yes.

is neither a citizen nor lawful permanent resident. Those mothers and fathers share "not only [a common] interest in the question, but one in common in the subject-matter of th[is] suit." *Scott* v. *Donald*, 165 U. S. 107, 116 (1897). Nor is there any doubt that at least the individual respondents adequately represent the injunction's beneficiaries: Like all affected parents, they "are necessarily interested in obtaining the relief sought" to preserve their children's citizenship. *Emmons* v. *National Mut. Bldg. & Loan Assn. of NY*, 135 F. 689, 691 (CA4 1905) (explaining the "well-known doctrine of equity jurisprudence" that " 'the relief sought by [a plaintiff]'" must be "'beneficial to those whom he undertakes to represent'" (quoting 1 R. White, F. Nichols, & H. Garrett, Daniell's Chancery Practice 243 (6th Am. ed. 1894))). What was true of bills of peace is thus true of these universal injunctions and universal injunctions generally, too: Both allow courts to "'adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures.'" *Ante,* at 13.

That bills of peace bear some resemblance to modern day Federal Rule of Civil Procedure 23 class actions does not mean they cannot also be a historical analogue to the universal injunction. Contra, *ante,* at 13 ("The bill of peace lives in modern form" as the "modern class action . . . governed in federal court by Rule 23," "not as the universal injunction"). In the majority's view, Rule 23 class actions, but not universal injunctions, would "be recognizable to an English Chancellor" because the limitations on class actions mirror those that applied to bills of peace. *Ante,* at 14 (Rule 23 "requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties who adequately protect the interests of the class"); cf. *supra*, at 25 (explaining why the universal injunctions in these cases are consistent with those limits). To the extent that English Chancellors would care about the differences between Rule 23 and universal injunctions,

the majority provides absolutely no reason to conclude they would think the former permissible and not the latter. To the contrary, unlike the Court today, the English Chancery Court recognized that principles of equity permit granting relief to nonparties. The history of bills of peace makes that apparent, particularly because they went beyond what Rule 23 permits. See *ante,* at 13–14 ("[T]he modern Rule 23 is in some ways 'more restrictive of representative suits than the original bills of peace'"). They are thus a common ancestor to both class actions and universal injunctions.

In any event, nothing in Rule 23 purports to supplant or modify federal courts' equitable authority under the Judiciary Act to grant relief to nonparties, nor could it. Contra, *ante,* at 14. The majority frets that universal injunctions, if permissible, will empower federal courts to create *de facto* class actions at will, thereby circumventing Rule 23's procedural protections. *Ibid.* Those concerns, however, have not been borne out in reality. Rule 23 has coexisted with universal injunctions against the Government for decades. Universal injunctions also cannot supplant the paradigm form of class actions, which seek money damages. In all events, to the extent the majority's concern has any teeth, reviewing courts are already well equipped to safeguard Rule 23's procedural protections. If there is a genuine lack of clarity as to the lawfulness of challenged Government action, district courts may well abuse their discretion by reflexively issuing universal injunctions where a Rule 23 class action would be more appropriate. See *Ashcroft* v. *American Civil Liberties Union*, 542 U. S. 656, 664 (2004) (standard of review for preliminary injunctions is "'abuse of discretion'").

The majority next insists that the practice of "founding-era courts of equity in the United States" cuts against universal injunctions, and that this Court "consistently rebuffed requests for relief that extended beyond the parties." *Ante*, at 8. The majority's account is irreconcilable with

early American bills of peace and the history of taxpayer suits. It further contradicts this Court's practice, in cases like *Lewis*, *Pierce*, and *Barnette*, of affirming and granting universal injunctions even when narrower, plaintiff-focused injunctions would have offered complete relief to the parties. See *supra*, at 20–21. The majority instead focuses on one case from 1897, in which this Court "permitted only a narro[w] decree between 'the parties named as plaintiff and defendants in the bill,'" *ante,* at 7 (quoting *Scott*, 165 U. S., at 117), over others, including from the same period, doing just the opposite. The majority offers no principled basis to deem the question resolved by a single case from 1897 while cases just a few years later charted a different course. Indeed, if the relevant inquiry turns on "founding-era practice," then there is no reason why a case from 1897 should be dispositive. *Ante,* at 9, n. 7.

In the majority's telling, *Scott* merely "illustrates that as late as 1897, this Court adhered to a party-specific view of relief." *Ante,* at 7–8, n. 6. Nothing in *Scott*, however, dictates that equitable relief must always be party specific. To the contrary, just one year after *Scott,* the Court endorsed the opposite view: "Only a court of equity," the Court explained, "is competent to . . . determine, once for all and without a multiplicity of suits, matters that affect not simply individuals, but the interests of the entire community." *Smyth* v. *Ames*, 169 U. S. 466, 518 (1898); see also *id*., at 517 ("[T]he circuit court of the United States, sitting in equity, can make a comprehensive decree covering the whole ground of controversy, and thus avoid the multiplicity of suits that would inevitably arise under the statute").[6]

_____

[6] Regardless of the actual decree the *Smyth* court approved, see *ante,* at 7–8, n. 6, its analysis clearly reveals that the Court understood equity to permit broad relief intended to benefit parties and nonparties alike. That is why this Court later approved or granted universal injunctions

The majority does not identify a single case, from the founding era or otherwise, in which this Court held that federal courts may never issue universal injunctions or broad equitable relief that extends to nonparties. That is to be expected, given the historical support for such relief and its use in bills of peace and taxpayer suits.

Most critically, the majority fundamentally misunderstands the nature of equity by freezing in amber the precise remedies available at the time of the Judiciary Act. Even as it declares that "'[e]quity is flexible,'" *ante,* at 11, the majority ignores the very flexibility that historically allowed equity to secure complete justice where the rigid forms of common law proved inadequate. Indeed, "[i]n th[e] early times [of the common law] the chief juridical employment of the chancellor must have been in devising new writs, directed to the courts of common law, to give remedy in cases where none before was administered." 3 Blackstone, Commentaries on the Laws of England, at 50. Adaptability has thus always been at the equity's core. Hence why equity courts "constantly decline[d] to lay down any rule which shall limit their power and discretion as to the particular cases, in which such injunctions shall be granted, or withheld." Story, Commentaries on Equity Jurisprudence §959(a), at 227. The Judiciary Act of 1789 codified equity itself, not merely a static list of remedies.

Historical analogues are no doubt instructive and provide important guidance, but requiring an exact historical match for every equitable remedy defies equity's purpose. Equity courts understood the "wisdom" in keeping injunctive relief flexible, for it was "impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs." *Ibid.* Of course,

_____

in *Lewis*, *Pierce*, and *Barnette* without "address[ing] the propriety of universal relief." *Ante,* at 9, n. 7. See also *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943).

in assessing whether a remedy falls within federal courts' equity jurisdiction under the Judiciary Act, this Court has asked "[w]hether the relief . . . was traditionally accorded by courts of equity." *Grupo Mexicano,* 527 U. S., at 319. *Grupo Mexicano*, however, does not dictate the level of generality for that historical inquiry, and general principles of equity that themselves existed at the founding militate against requiring a near exact match as the majority does. Cf. *United States* v. *Rahimi*, 602 U. S. 680, 692 (2024) ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin'").

Indeed, equitable relief in the United States has evolved in one respect to protect rights and redress wrongs that even the majority does not question: Plaintiffs today may obtain plaintiff-protective injunctions against Government officials that block the enforcement of unconstitutional laws, relief exemplified by *Ex parte Young*, 209 U. S. 123 (1908). That remedy, which traces back to the equity practice of mid-19th century courts, finds no analogue in the relief exercised in the English Court of Chancery, which could not enjoin the Crown or English officers. See *supra*, at 24, n. 4; see also Sohoni, 133 Harv. L. Rev., at 928, 1002–1006; see also R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 958–959 (5th ed. 2003) (noting that, in *Young*, "the threatened conduct of the defendant would not have been an actionable wrong at common law" and that the "principle [in *Young*] has been easily absorbed in suits challenging *federal* official action"). Under the majority's rigid historical test, however, even plaintiff-protective injunctions against

patently unlawful Government action should be impermissible.[7]  Such a result demonstrates the folly of treating equity as a closed system, rather than one designed to adapt to new circumstances.

The relative absence of universal injunctions against the United States before the late 20th century, moreover, reflects constitutional and procedural limitations on judicial power, not equitable ones.  Brief for Legal Historians in No. 24A884 as *Amici Curiae* 13–16.  Until the enactment of the Amendments to the Administrative Procedure Act in 1976, sovereign immunity barred most suits against the Federal Government.  *Id.*, at 14–15 (citing G. Sisk, Litigation With the Federal Government §4.10(b), p. 339 (2016)).  Officer suits against Cabinet officials before that point, moreover, could be brought only in Washington, D. C., due to limits on personal jurisdiction and venue that existed at the time.  Brief for Legal Historians in No. 24A884 as *Amici Curiae* 15–16.  The later emergence of universal injunctions against the United States followed the removal of those barriers and the expansion of federal actions and laws.  The rise of universal injunctions therefore represents equity's essential adaptation to modern governance.

It is a "common expression . . . that Courts of Equity delight to do justice, and not by halves."  Story, Commentaries on Equity Pleadings §72, at 74.  The majority, however, delights to do justice by piecemeal.  Its decision to strip the federal courts of the authority to issue universal injunctions of even flagrantly unlawful Government action represents a grave and unsupported diminution of the judicial power of equity.  Centuries ago, Chief Justice Marshall warned that "[i]f the legislatures of the several states may, at will,

_____

[7] The majority's expressed support for such injunctions is thus irreconcilable with its view that equitable remedies must be very closely "'analogous' to the relief '"exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act."'"  *Ante,* at 6.

annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery." *United States* v. *Peters*, 5 Cranch 115, 136 (1809). The Court should have heeded that warning today.

C

Even the majority's view of the law cannot justify issuance of emergency relief to the Government in these cases, for the majority leaves open whether these particular injunctions may pass muster under its ruling. Indeed, the lower courts issued the challenged injunctions consistent with an equitable principle that even the majority embraces: Courts may award an equitable remedy when it is "necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). As the majority recounts, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" *Ante,* at 16 (quoting *Kinney-Coastal Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (1928); emphasis deleted).[8]

So too does the Court recognize that, in some cases, complete relief will require a broad remedy that necessarily benefits nonparties. See *ante,* at 17, n. 13 ("There may be other injuries for which it is all but impossible for courts to craft relief that is both complete *and* benefits only the named plaintiffs"); see also *Gill* v. *Whitford*, 585 U. S. 48, 66–67 (2018) ("[T]he only way to vindicate an individual plaintiff's right to an equally weighted vote [is] through a wholesale 'restructuring of the geographical distribution of seats in a state legislature'"). Hence the majority's nui-

───────────

[8] That explains the majority's bottom line, in which it declares that the Government's applications are "granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Ante*, at 27.

sance hypothetical: If a plaintiff sues her neighbor for playing loud music at night, a court can order the neighbor to turn off the music at night, even if doing so will naturally benefit other neighbors who are not parties to the suit. See *ante,* at 16–17.

The majority need not resort to hypotheticals, however, because the very injunctions in these cases were necessary to give respondents complete relief. Indeed, each District Court found that a universal injunction was the only feasible option to redress fully respondents' injuries. See 763 F. Supp. 3d, at 746 (concluding that "[o]nly a nationwide injunction will provide complete relief to the plaintiffs" because the organizational plaintiffs have "'over 680,000 members . . . who reside in all 50 U.S. states and several U.S. territories'" and "'[h]undreds or even thousands'" of those members "'will give birth to children in the United States over the coming weeks and months'" (alterations in original)); 765 F. Supp. 3d, at 1153 ("[A] geographically limited injunction would be ineffective, as it would not completely relieve [the plaintiff States] of the Order's financial burden(s)"); 766 F. Supp. 3d, at 288 (explaining that "injunctive relief limited to the State plaintiffs [would be] inadequate" because it would "fai[l] in providing complete relief to the State plaintiffs").

Recognizing as much, the majority retreats to the view that, even if a court "*can* award complete relief," it "*should* [not] do so" reflexively. *Ante,* at 18; see also *ibid.* ("Complete relief is not a guarantee—it is the maximum a court can provide"); *ante,* at 2 (opinion of THOMAS, J.) (suggesting courts "err insofar as they treat complete relief as a mandate"). Even so, the Court never suggests that the District Courts in these cases should not have awarded relief to the parties that completely remedied their alleged injuries. Nor could it. The majority recognizes that "in equity, 'the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.'" *Ante,* at 18–19.

Here, respondents paired their respective requests for complete relief with the strongest story possible: Without such relief, an executive order that violates the Constitution, federal law, Supreme Court precedent, history, and over a century of Executive Branch practice would infringe upon their constitutional rights or cause them to incur significant financial and administrative costs.

Perhaps that is why the majority leaves open the possibility that the District Courts, in these cases, could have granted at least respondent States a nationwide injunction consistent with the notion of "complete relief." The majority recognizes, correctly, that the Massachusetts District Court "decided that a universal injunction was necessary to provide the States *themselves* with complete relief." *Ante,* at 18.[9] And the majority does not dispute the basis for those decisions: "Children often move across state lines or are born outside their parents' State of residence," and "th[is] cross-border flow" would make an injunction protecting only children born in the party States "unworkable." *Ante,* 18. A narrower injunction would "require [the States] to track and verify the immigration status of the parents of every child, along with the birth State of every child for whom they provide certain federally funded benefits." *Ante*, at 18. Unrebutted record evidence bears this out and shows that the Citizenship Order would irreparably harm the States, even if it does not apply to children born within their boundaries. The Court does not contend otherwise. That should be the end of the matter.

---

[9] In the majority's telling, the Washington District Court "acknowledged the state respondents' complete relief argument but primarily granted a universal injunction" based on its weighing of the equities. See *ante,* at 18, n. 14. Not so. That court carefully explained why "a geographically limited injunction would be ineffective, as it would not completely relieve [the States] of the Order's financial burden(s)." 765 F. Supp. 3d 1142, 1153–1154 (2025). A narrower injunction, it explained, would be "unworkable" and would itself likely impose new "recordkeeping and administrative burden[s]" on the States. *Id*., at 1154.

Nevertheless, the majority suggests that the District Courts might consider, after this Court hands down its decision, whether some alternative narrower injunction would provide the States complete relief. See *ibid.* What would such an injunction look like, and would it be feasible? The Court does not say. The majority does note, but takes no position on, two narrower injunctions the Government claims would still give complete relief to the States: an order prohibiting the Government from enforcing the Citizenship Order in respondent States, including as to state residents born elsewhere; or an order directing the Government to treat children covered by the Citizenship Order as eligible for federally funded welfare benefits when those children reside in a respondent State. See *ibid.* (citing Application for Partial Stay of Injunction in No. 24A884, p. 23).

As an initial matter, the Government never raised those narrower injunctions to the District Courts, meaning it forfeited them. That is what the First Circuit expressly held, 131 F. 4th, at 43 ("declining to consider" those alternatives because they were "raised for [the] first time . . . in support of stay pending appeal of preliminary injunction"), and the majority does not dispute the point. It is true that plaintiffs seeking a preliminary injunction bear the burden of making "a clear showing that [they are] entitled to such relief." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008). The States met that burden, however: They presented what is still uncontroverted evidence that an injunction applicable only to children born within their borders would give them less than complete relief. Accordingly, it was reasonable for the District Courts to fashion the remedies that they did, for they were "not obligated to undertake the task of chiseling from the government's across-the-board [Executive Order] a different policy the government never identified, endorsed, or defended." *J. D.* v. *Azar*, 925 F. 3d 1291, 1336 (CADC 2019) (*per curiam*).

Those proffered alternatives, moreover, are unworkable

on their face. Each would require creating a two-tiered
scheme in which the Government's recognition of some chil-
dren's citizenship status or eligibility for federally funded
benefits would change based on whether a child resides in
one of respondent States at any given moment. That
scheme would have to operate, somehow, without imposing
an administrative burden on respondent States or disrupt-
ing their receipt of federal funds to which they are entitled.
"[T]he regular movement of the American people into and
out of different States . . . would make it difficult to sensibly
maintain such a scattershot system." *Ante,* at 5 (opinion of
KAVANAUGH, J.).

Such a system would also be incompatible with federal
law. Some statutes, like those governing Medicaid and
Supplemental Nutrition Assistance Program (SNAP) bene-
fits, require States to give benefits only to applicants with
a Social Security number and to use those numbers for cer-
tain administrative purposes. See, *e.g.*, 7 U. S. C. §2025(e);
42 U. S. C. §1320b–7(a)(1). States could not comply with
those laws under the Government's alternative injunctions
because children covered by the Citizenship Order in non-
party States would still be treated as noncitizens at birth.
Thus, when some of those children later move to one of re-
spondent States, they would lack Social Security numbers.
No matter how it is done, discarding the nationwide status
quo of birthright citizenship would result in chaos.

What is more, the principle of complete relief does not re-
quire courts to award only the absolute narrowest injunc-
tion possible. To conclude otherwise would eviscerate the
"discretion and judgment" that is integral to the crafting of
injunctive relief. *International Refugee Assistance Project*,
582 U. S., at 579. Indeed, equitable relief "[t]raditionally
. . . has been characterized by a practical flexibility in shap-
ing its remedies and by a facility for adjusting and reconcil-
ing public and private needs." *Brown* v. *Board of Educa-
tion*, 349 U. S. 294, 300 (1955) (footnote omitted). That is

why the court in the majority's nuisance hypothetical can "order the defendant to turn her music down," or to turn it "off," even though the latter is technically more burdensome on the defendant than necessary to give the plaintiff complete relief. *Ante,* at 16.

Accordingly, the District Courts appropriately determined that the "only one feasible option" that would give complete relief to the States was a universal injunction. See *ibid.* Clearly, the majority is asking the lower courts themselves to explain what is patently obvious about the Government's proposed injunctions and any others that can be imagined.

Inexplicably, however, the Court declares that, for the associational and individual respondents, injunctions enjoining the Government from enforcing the Citizenship Order against them (and only them) would have sufficed. See *ante,* at 17–18. In fashioning equitable relief, however, courts must take into account "'what is workable.'" *North Carolina* v. *Covington*, 581 U. S. 486, 488 (2017) (*per curiam*). Just like the injunction that the majority blesses in the context of its nuisance-suit hypothetical, which will bestow a peaceful night upon the plaintiff's neighbors even when the plaintiff is not herself at home, the preliminary injunction for the associational and individual respondents reflects what is practicable. As the Maryland District Court found, "'hundreds or even thousands'" of the associational respondents' members, who reside in all 50 States, "'will give birth to children in the United States over the coming weeks and months.'" 763 F. Supp. 3d, at 746. Theoretically, it might be possible for a court to fashion an injunction that runs to each of the thousands of expectant mothers in that group. But see *ante,* at 5 (opinion of KAVANAUGH, J.) ("Often, it is not especially workable or sustainable or desirable to have a patchwork scheme . . . in which a major new federal statute or executive action . . . applies to some people or organizations in certain States or

regions, but not to others"). Yet anything less than a na-
tionwide injunction creates a risk that the Government, in-
advertently or intentionally, will enforce the Citizenship
Order against some of the plaintiffs' children before this
Court rules definitively on the Order's lawfulness.

A narrower injunction would necessarily task "[t]hose [re-
sponsible for] determining a baby's citizenship status . . .
with [correctly] confirming [biological] parentage, the citi-
zenship or immigration status of both [biological] parents,
and membership in specific organizations." Opposition to
Application for Partial Stay of Injunction in No. 24A884, p.
24. That, in turn, would "impose an enormous burden on
expecting parents, membership organizations, government
employees at all levels, and hospital staff," increasing the
risk of mistake. *Ibid.* The risk of noncompliance is also
particularly stark here, where the challenged action itself
reflects an utter disregard for settled precedent, and given
the Government's repeated insistence that it need not pro-
vide notice to individuals before their sudden deportations.
See, *e.g.*, *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025)
(*per curiam*) (slip op., at 2); *Department of Homeland Secu-
rity* v. *D. V. D.*, 606 U. S. ___, ___ (2025) (SOTOMAYOR, J.,
dissenting) (slip op., at 15). The majority does not identify
a narrower alternative that is both practical and mitigates
that risk.

At the very least, there is no reason to think that the Dis-
trict Court abused its discretion in deciding that only a na-
tionwide injunction could protect the plaintiffs' fundamen-
tal rights. See *Ashcroft*, 542 U. S., at 664 (setting forth the
standard of review). "Crafting a preliminary injunction,"
after all, "is an exercise of discretion and judgment, often
dependent as much on the equities of a given case as the
substance of the legal issues it presents." *International Ref-
ugee Assistance Project*, 582 U. S., at 579. Applying defer-
ential abuse-of-discretion review, the Fourth Circuit em-
phasized that the "[t]he district court . . . carefully

explained why an injunction limited to the parties—including organizations with hundreds of thousands of members nationwide—would be unworkable in practice and thus fail to provide complete relie[f] to the plaintiffs." 2025 WL 654902, *1. The majority gives no justification for deeming the District Court's reasoned assessment an abuse of discretion.

### D

The equities and public interest weigh decisively against the Government. For all of the reasons discussed, the Citizenship Order is patently unconstitutional. To allow the Government to enforce it against even one newborn child is an assault on our constitutional order and antithetical to equity and public interest. Cf. *Salazar* v. *Buono*, 559 U. S. 700, 714–715 (2010) (plurality opinion) ("'[A] court must never ignore . . . circumstances underlying [equitable relief] lest the decree be turned into an "instrument of wrong"'").

Meanwhile, newborns subject to the Citizenship Order will face the gravest harms imaginable. If the Order does in fact go into effect without further intervention by the District Courts, children will lose, at least for the time being, "a most precious right," *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 159 (1963), and "cherished status" that "carries with it the privilege of full participation in the affairs of our society," *Knauer* v. *United States*, 328 U. S. 654, 658 (1946). Affected children also risk losing the chance to participate in American society altogether, unless their parents have sufficient resources to file individual suits or successfully challenge the Citizenship Order in removal proceedings. Indeed, the Order risks the "creation of a substantial 'shadow population'" for covered children born in the United States who remain here. *Plyler*, 457 U. S., at 218. Without Social Security numbers and other documentation, these children will be denied critical public services, like SNAP and Medicaid, and lose the ability to engage fully in

civic life by being born in States that have not filed a law-
suit. Worse yet, the Order threatens to render American-
born children stateless, a status "deplored in the interna-
tional community" for causing "the total destruction of the
individual's status in organized society." *Trop* v. *Dulles*,
356 U. S. 86, 101–102 (1958) (plurality opinion). That
threat hangs like a guillotine over this litigation.

The Order will cause chaos for the families of all affected
children too, as expecting parents scramble to understand
whether the Order will apply to them and what ramifica-
tions it will have. If allowed to take effect, the Order may
even wrench newborns from the arms of parents lawfully in
the United States, for it purports to strip citizenship from
the children of parents legally present on a temporary ba-
sis. See 90 Fed. Reg. 8449. Those newborns could face de-
portation, even as their parents remain lawfully in the
country. In light of all these consequences, there can be no
serious question over where the equities lie in these cases.

IV

The Court's decision is nothing less than an open invita-
tion for the Government to bypass the Constitution. The
Executive Branch can now enforce policies that flout settled
law and violate countless individuals' constitutional rights,
and the federal courts will be hamstrung to stop its actions
fully. Until the day that every affected person manages to
become party to a lawsuit and secures for himself injunctive
relief, the Government may act lawlessly indefinitely.

Not even a decision from this Court would necessarily
bind the Government to stop, completely and permanently,
its commission of unquestionably unconstitutional conduct.
The majority interprets the Judiciary Act, which defines
the equity jurisdiction for all federal courts, this Court in-
cluded, as prohibiting the issuance of universal injunctions
(unless necessary for complete relief). What, besides eq-
uity, enables this Court to order the Government to cease

completely the enforcement of illegal policies? The majority does not say. So even if this Court later rules that the Citizenship Order is unlawful, we may nevertheless lack the power to enjoin enforcement as to anyone not formally a party before the Court. In a case where the Government is acting in open defiance of the Constitution, federal law, and this Court's holdings, it is naive to believe the Government will treat this Court's opinions on those policies as "*de facto*" universal injunctions absent an express order directing total nonenforcement. *Ante*, at 6 (opinion of KAVANAUGH, J.).

Indeed, at oral argument, the Government refused to commit to obeying any court order issued by a Federal Court of Appeals holding the Citizenship Order unlawful (except with respect to the plaintiffs in the suit), even within the relevant Circuit. Tr. of Oral Arg. 61–63. To the extent the Government cannot commit to compliance with Court of Appeals decisions in those Circuits, it offers no principled reason why it would treat the opinions of this Court any differently nationwide. Thus, by stripping even itself of the ability to issue universal injunctions, the Court diminishes its role as "the ultimate decider of the interim [and permanent] legal status of major new federal statutes and executive actions." *Ante*, at 3 (opinion of KAVANAUGH, J.).

There is a serious question, moreover, whether this Court will ever get the chance to rule on the constitutionality of a policy like the Citizenship Order. Contra, *ante*, at 6 (opinion of KAVANAUGH, J.) ("[T]he losing parties in the courts of appeals will regularly come to this Court in matters involving major new federal statutes and executive actions"). In the ordinary course, parties who prevail in the lower courts generally cannot seek review from this Court, likely leaving it up to the Government's discretion whether a petition will

be filed here.[10]  These cases prove the point: Every court to consider the Citizenship Order's merits has found that it is unconstitutional in preliminary rulings.  Because respondents prevailed on the merits and received universal injunctions, they have no reason to file an appeal.  The Government has no incentive to file a petition here either, because the outcome of such an appeal would be preordained.  The Government recognizes as much, which is why its emergency applications challenged only the scope of the preliminary injunctions.

Even accepting that this Court will get the opportunity to "ac[t] as the ultimate decider" of patently unlawful policies, *ante,* at 3 (opinion of KAVANAUGH, J.), and that the Executive Branch will treat this Court's opinions as *de facto* universal injunctions,[11] it is still necessary for the lower courts to have the equitable authority to issue universal injunctions, too.  As JUSTICE KAVANAUGH notes, it can take, at a minimum, "*weeks*" for an application concerning a major

---

[10] On rare occasion, this Court has permitted a party who prevailed in the lower courts nonetheless to obtain this Court's review of a legal question.  See, *e.g.*, *Camreta* v. *Greene*, 563 U. S. 692, 698 (2011) (allowing a government official who prevailed on grounds of qualified immunity to challenge an underlying adverse constitutional ruling).  Those exceptions have no relevance here, however, because there is no adverse determination for respondents to challenge.

[11] The majority insists that the constitutionality of the Citizenship Order will come before this Court eventually and that, when it does, the Government will obey this Court's resulting opinion with respect to all newborn children.  *Ante,* at 25, n. 18.  Why?  The majority is sure that the Government will honor its oral-argument promises to "'seek cert'" when it "'lose[s] one of'" its pending appeals and to "respect both the judgments and opinions of this Court."  *Ibid.* (quoting Tr. of Oral Arg. 50).  The majority's certainty that the Government will keep its word is nothing short of a leap of faith, given that the Government has adopted a plainly unconstitutional policy in defiance of this Court's precedent and then gamed the system to stymie this Court's consideration of the policy's merits.  In any event, the Government's promise is cold comfort to the many children whose parents do not file a lawsuit and whose citizenship status remains in flux pending this Court's review.

new policy to reach this Court. *Ibid.* In the interim, the Government may feel free to execute illegal policies against nonparties and cause immeasurable harm that this Court may never be able to remedy. Indeed, in these cases, there is a serious risk the Government will seek to deport newborns whose parents have not filed suit if all the injunctions are narrowed on remand. That unconscionable result only underscores why it is necessary, in some cases, for lower courts to issue universal injunctions.

Fortunately, in the rubble of its assault on equity jurisdiction, the majority leaves untouched one important tool to provide broad relief to individuals subject to lawless Government conduct: Rule 23(b)(2) class actions for injunctive relief. That mechanism may provide some relief, but it is not a perfect substitute for a universal injunction. First, a named plaintiff must incur the higher cost of pursuing class relief, which will involve, at a minimum, overcoming the hurdle of class certification. "'[D]emonstrating th[e] prerequisites'" of numerosity, commonality and typicality and the adequacy of the named plaintiff to represent the class "'is difficult and time consuming and has been getting harder as a result of recent court decisions and federal legislation.'" *Chicago* v. *Barr*, 961 F. 3d 882, 917 (CA7 2020) (quoting A. Frost, In Defense of Nationwide Injunctions, 93 N. Y. U. L. Rev. 1065, 1096 (2018); alterations in original). "'Courts have heightened the evidentiary standard for class certification'" as well, "'requiring hearings and sometimes significant amounts of evidence on the merits of the class before certifying the class.'" 961 F. 3d, at 917. In recent years, moreover, "'courts have started to deny class certification if they think there has been a flaw in class definition,'" sometimes "'without first allowing the plaintiffs to amend that definition in response to the court's concerns.'" *Ibid.* What is more, "'defendants can seek interlocutory review of a court's decision to certify a class, adding further delay and expense to the certification process.'" *Ibid.*

Hence why some "'describ[e] the class certification process as a "drawn-out procedural bog," which comes with significant expense and delay for the would be class member.'" *Ibid.* Indeed, at oral argument, the Government refused to concede that a class could be certified to challenge the Citizenship Order and promised to invoke Rule 23's barriers to stop it. See Tr. of Oral Arg. 31–32.

Nevertheless, the parents of children covered by the Citizenship Order would be well advised to file promptly class-action suits and to request temporary injunctive relief for the putative class pending class certification. See *A. A. R. P.*, 605 U. S., at ___ (slip op., at 7); *Califano*, 442 U. S., at 701–703; see also *ante,* at 1–2 (opinion of KAVANAUGH, J.) (recognizing that lower courts, in some circumstances, can "award preliminary classwide relief that may . . . be statewide, regionwide, or even nationwide"). For suits challenging policies as blatantly unlawful and harmful as the Citizenship Order, moreover, lower courts would be wise to act swiftly on such requests for relief and to adjudicate the cases as quickly as they can so as to enable this Court's prompt review.

\*　　\*　　\*

The rule of law is not a given in this Nation, nor any other. It is a precept of our democracy that will endure only if those brave enough in every branch fight for its survival. Today, the Court abdicates its vital role in that effort. With the stroke of a pen, the President has made a "solemn mockery" of our Constitution. *Peters*, 5 Cranch, at 136. Rather than stand firm, the Court gives way. Because such complicity should know no place in our system of law, I dissent.

# SUPREME COURT OF THE UNITED STATES

---

No. 24A884

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

---

No. 24A885

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

---

No. 24A886

---

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE JACKSON, dissenting.

I agree with every word of JUSTICE SOTOMAYOR's dissent. I write separately to emphasize a key conceptual point: The Court's decision to permit the Executive to violate the Constitution with respect to anyone who has not yet sued is an existential threat to the rule of law.

It is important to recognize that the Executive's bid to vanquish so-called "universal injunctions" is, at bottom, a request for this Court's permission to engage in unlawful behavior. When the Government says "do not allow the lower courts to enjoin executive action universally as a remedy for unconstitutional conduct," what it is actually saying

is that the Executive wants to continue doing something that a court has determined violates the Constitution—please allow this. That is some solicitation. With its ruling today, the majority largely grants the Government's wish. But, in my view, if this country is going to persist as a Nation of laws and not men, the Judiciary has no choice but to deny it.

Stated simply, what it means to have a system of government that is bounded by law is that everyone is constrained by the law, no exceptions. And for that to actually happen, courts must have the power to order everyone (including the Executive) to follow the law—full stop. To conclude otherwise is to endorse the creation of a zone of lawlessness within which the Executive has the prerogative to take or leave the law as it wishes, and where individuals who would otherwise be entitled to the law's protection become subject to the Executive's whims instead.

The majority cannot deny that our Constitution was designed to split the powers of a monarch between the governing branches to protect the People. Nor is it debatable that the role of the Judiciary in our constitutional scheme is to ensure fidelity to law. But these core values are strangely absent from today's decision. Focusing on inapt comparisons to impotent English tribunals, the majority ignores the Judiciary's foundational duty to uphold the Constitution and laws of the United States. The majority's ruling thus not only diverges from first principles, it is also profoundly dangerous, since it gives the Executive the go-ahead to sometimes wield the kind of unchecked, arbitrary power the Founders crafted our Constitution to eradicate. The very institution our founding charter charges with the duty to ensure universal adherence to the law now requires judges to shrug and turn their backs to intermittent lawlessness. With deep disillusionment, I dissent.

## I

To hear the majority tell it, this suit raises a mind-numbingly technical query: Are universal injunctions "sufficiently 'analogous' to the relief issued 'by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act'" to fall within the equitable authority Congress granted federal courts in the Judiciary Act of 1789? *Ante*, at 6. But that legalese is a smokescreen. It obscures a far more basic question of enormous legal and practical significance: May a federal court in the United States of America order the Executive to follow the law?

## A

To ask this question is to answer it. In a constitutional Republic such as ours, a federal court has the power to order the Executive to follow the law—and it must. It is axiomatic that the Constitution of the United States and the statutes that the People's representatives have enacted govern in our system of government. Thus, everyone, from the President on down, is bound by law. By duty and nature, federal courts say what the law is (if there is a genuine dispute), and require those who are subject to the law to conform their behavior to what the law requires. This is the essence of the rule of law.

Do not take my word for it. Venerated figures in our Nation's history have repeatedly emphasized that "[t]he essence of our free Government is 'leave to live by no man's leave, underneath the law'—to be governed by those impersonal forces which we call law." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 654 (1952) (R. Jackson, J., concurring). "Our Government is fashioned to fulfill this concept so far as humanly possible." *Id.*, at 654–655. Put differently, the United States of America has ""'a government of laws and not of men.""'" *Cooper* v. *Aaron*, 358 U. S. 1, 23 (1958) (Frankfurter, J., concurring) (quoting *United States*

v. *Mine Workers*, 330 U. S. 258, 307 (1947) (Frankfurter, J.,
concurring in judgment)); see also, *e.g.*, Mass. Const., pt. 1,
Art. XXX (1780), in 3 Federal and State Constitutions 1893
(F. Thorpe ed. 1909) (J. Adams); *Marbury* v. *Madison*, 1
Cranch 137, 163 (1803) (Marshall, C. J., for the Court);
*United States* v. *Dickson*, 15 Pet. 141, 162 (1841) (Story, J.,
for the Court).

That familiar adage is more than just mere "'rhetorical
flourish.'" *Cooper*, 358 U. S., at 23. It is "'the rejection in
positive terms of rule by fiat, whether by the fiat of govern-
mental or private power.'" *Ibid.* Indeed, "constitutionalism
has one essential quality: it is a legal limitation on govern-
ment; it is the antithesis of arbitrary rule; its opposite is
despotic government, the government of will instead of
law." C. McIlwain, *Constitutionalism*: Ancient and Modern
21–22 (rev. ed. 1947); see also *id.*, at 21 ("All constitutional
government is by definition limited government").

Those who birthed our Nation limited the power of gov-
ernment to preserve freedom. As they knew all too well,
"constant experience shows us that every man invested
with power is apt to abuse it, and to carry his authority as
far as it will go." Montesquieu, The Spirit of Laws, in 38
Great Books of the Western World 69 (T. Nugent transl., R.
Hutchins ed. 1952). But the Founders reasoned that the
vice of human ambition could be channeled to prevent the
country from devolving into despotism—ambition could be
"made to counteract ambition." The Federalist No. 51, p.
322 (C. Rossiter ed. 1961) (J. Madison). If there were, say,
a Constitution that divided power across institutions "in
such a manner as that each may be a check on the other,"
then it could be possible to establish Government by and for
the People and thus stave off autocracy. *Ibid.*; see also *My-
ers* v. *United States*, 272 U. S. 52, 293 (1926) (Brandeis, J.,
dissenting) ("The doctrine of the separation of powers was
adopted by the Convention of 1787, not to promote effi-
ciency but to preclude the exercise of arbitrary power").

Through such separated institutions, power checks power. See Montesquieu, The Spirit of Laws, at 69. Our system of institutional checks thus exists for a reason: so that "the private interest of every individual may be a sentinel over the public rights." The Federalist No. 51, at 322.

## B

The distribution of power between the Judiciary and the Executive is of particular importance to the operation of a society governed by law. Made up of "'free, impartial, and independent'" judges and justices, the Judiciary checks the political branches of Government by explaining what the law is and "securing obedience" with it. *Mine Workers*, 330 U. S., at 308, 312 (opinion of Frankfurter, J.); see *Marbury*, 1 Cranch, at 177. The federal courts were thus established "not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government." *United States* v. *Lee*, 106 U. S. 196, 220 (1882).

Quite unlike a rule-of-kings governing system, in a rule-of-law regime, nearly "[e]very act of government may be challenged by an appeal to law." *Cooper*, 358 U. S., at 23 (opinion of Frankfurter, J.). In this country, the Executive does not stand above or outside of the law. Consequently, when courts are called upon to adjudicate the lawfulness of the actions of the other branches of Government, the Judiciary plays "an essential part of the democratic process." *Mine Workers*, 330 U. S., at 312. Were it otherwise—were courts unable or unwilling to command the Government to follow the law—they would "sanctio[n] a tyranny" that has no place in a country committed to "well-regulated liberty and the protection of personal rights." *Lee*, 106 U. S., at 221. It is law—and "'Law alone'"—that "'saves a society from being rent by internecine strife or ruled by mere brute power however disguised.'" *Cooper*, 358 U. S., at 23 (quoting *Mine Workers*, 330 U. S., at 308).

The power to compel the Executive to follow the law is particularly vital where the relevant law is the Constitution. When the Executive transgresses an Act of Congress, there are mechanisms through which Congress can assert its check against the Executive unilaterally—such as, for example, asserting the power of the purse. See K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1360 (1988) (describing Congress's ability to "regulat[e] executive branch activities by limitations on appropriations"). But when the Executive violates the Constitution, the only recourse is the courts. Eliminate that check, and our government ceases to be one of "limited powers." *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991). After all, a limit that "do[es] not confine the perso[n] on whom [it is] imposed" is no limit at all. *Marbury*, 1 Cranch, at 176.[1]

## II

With that background, we can now turn to this suit and

―――――――――

[1] These foundational separation-of-powers principles are, of course, the doctrinal underpinnings of the observations I make in Parts II and III, *infra*. If my point is "difficult to pin down," *ante*, at 22, that could be due to the majority's myopic initial framing—it casts today's emergency applications as being solely about the scope of judicial authority, while ignoring (or forgetting) the concomitant expansion of executive power that results when the equitable remedial power of judges is needlessly restricted. Or perhaps the culprit is the majority's threshold decision to rest its holding solely on the Judiciary Act, *ante*, at 5, n. 4, thereby facilitating its convenient sidestepping of the startling constitutional implications that follow from blanket limitations on the Judiciary's response to the Executive's lawlessness. Whatever the source of the majority's confusion, there is no question that its statutory holding restricting the traditional equitable power of federal courts to craft a suitable remedy for established (or likely) constitutional violations has significant ramifications for the separation of powers and for constitutional rights more broadly. JUSTICE SOTOMAYOR thoroughly explains why restricting judges in this manner is legally and historically unfounded. My goal is to highlight the myriad ways in which the majority's newly minted no-universal-injunctions limitation also subverts core constitutional norms and is fundamentally incompatible with the rule of law.

focus on the ways in which the majority's ruling undermines our constitutional system. JUSTICE SOTOMAYOR has laid out the relevant facts, see *ante*, at 9–13 (dissenting opinion), and I will not repeat what she has said. It suffices for my purposes to reiterate that, before these applications arrived here, three District Courts had concluded that Executive Order No. 14160—which attempts to alter the Constitution's express conferral of citizenship on all who are born in this Nation, Amdt. 14, §1—likely violates the Constitution. Those courts each thus enjoined the Executive from enforcing that order anywhere, against anyone. See 763 F. Supp. 3d 723 (Md. 2025), appeal pending, No. 25–1153 (CA4); 765 F. Supp. 3d 1142 (WD Wash. 2025), appeal pending, No. 25–807 (CA9); *Doe* v. *Trump*, 766 F. Supp. 3d 266 (Mass. 2025), appeal pending, No. 25–1170 (CA1). Three Courts of Appeals then declined to upset these injunctions during the pendency of the Government's appeals. See 2025 WL 654902 (CA4, Feb. 28, 2025); 2025 WL 553485 (CA9, Feb. 19, 2025); 131 F. 4th 27 (CA1 2025).

The majority now does what none of the lower courts that have considered Executive Order No. 14160 would do: It allows the Executive's constitutionally dubious mandate to go into effect with respect to anyone who is not already a plaintiff in one of the existing legal actions. Notably, the Court has *not* determined that any of the lower courts were *wrong* about their conclusion that the executive order likely violates the Constitution—the Executive has not asked us to rule on the lawfulness of Executive Order No. 14160. But the majority allows the Executive to implement this order (which lower courts have so far uniformly declared likely unconstitutional) nonetheless.

Given the critical role of the Judiciary in maintaining the rule of law, see Part I, *supra*, it is odd, to say the least, that the Court would grant the Executive's wish to be freed from the constraints of law by prohibiting district courts from ordering complete compliance with the Constitution. But the

majority goes there. It holds that, even assuming that Executive Order No. 14160 violates the Constitution, federal courts lack the power to prevent the Executive from continuing to implement that unconstitutional directive.

As I understand the concern, in this clash over the respective powers of two coordinate branches of Government, the majority sees a power grab—but not by a presumably lawless Executive choosing to act in a manner that flouts the plain text of the Constitution. Instead, to the majority, the power-hungry actors are . . . (wait for it) . . . the district courts. See *ante*, at 1 (admonishing district courts for daring to "asser[t] the power" to order the Executive to follow the law universally). In the majority's view, federal courts only have the power to "afford the plaintiff complete relief" in the cases brought before them; they can do nothing more. *Ante*, at 16. And the majority thinks a so-called universal injunction—that is, a court order requiring the Executive to follow the law across the board and not just with respect to the plaintiff—"grant[s] relief to nonparties." See *ante*, at 6–8. Therefore, the majority reasons, issuing such orders exceeds district courts' authority. See *ante*, at 21.

So many questions arise.[2] The majority's analysis is fully

------

[2] Although I will not spend much space discussing it here, the majority's primary premise—that universal injunctions "grant relief to nonparties"—is suspect. When a court issues an injunction (universal or otherwise), it does so via an order that governs the relationship between the plaintiff and the defendant. Fed. Rule Civ. Proc. 65(d). That order provides the plaintiff with *relief*: If the plaintiff believes that the defendant has violated the court's order, she may come back to court, injunction in hand, and demand enforcement or compensation through the mechanism of civil contempt. See *Longshoremen* v. *Philadelphia Marine Trade Assn.*, 389 U. S. 64, 75 (1967) (recognizing that an "injunction" is "an equitable decree compelling obedience under the threat of contempt"). As the majority recognizes, nonparties may benefit from an injunction a court issues in a plaintiff's case. See *ante*, at 16. But that does not mean those incidental beneficiaries have received relief—"the injunction's pro-

interrogated, and countered, in JUSTICE SOTOMAYOR's dissent. My objective is to expose the core conceptual fallacy underlying the majority's reasoning, which, to me, also tends to demonstrate why, and how, today's ruling threatens the rule of law.

The pillar upon which today's ruling rests is the majority's contention that the remedial power of the federal courts is limited to granting "complete relief" to the parties. *Ante*, at 15–16. And the majority's sole basis for that prop-

–––––––––

tection" (*i.e.*, the ability to seek contempt) "extends only to the suing plaintiff." *Ante*, at 17.

An injunction prohibiting the Executive from acting unlawfully operates precisely the same way. Such an injunction may benefit nonparties as a practical matter—but only the named plaintiffs have the right to return to the issuing court and seek contempt, if the Executive fails to comply. See *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444–445 (1911) ("Proceedings for civil contempt are between the original parties"); *Buckeye Coal & R. Co.* v. *Hocking Valley R. Co.*, 269 U. S. 42, 48–49 (1925) (holding that a nonparty injured by the defendant's noncompliance with an injunction could not enforce the injunction); cf. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 750 (1975) ("[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it"). So, the majority's concern that universal injunctions inappropriately grant "relief" to nonparties is incorrect. Nonparties may *benefit* from an injunction, but only the plaintiff gets *relief*.

Federal Rule of Civil Procedure 71 is not to the contrary. Contra, *ante*, at 15, n. 11. At most, that rule and the cases the majority cites suggest that, in certain narrow circumstances, a nonparty for whose benefit an injunction was issued may be able to go to the issuing court and seek contempt. But "the precise contours of Rule 71 . . . remain unclear," *Beckett* v. *Air Line Pilots Assn.*, 995 F. 2d 280, 287–288 (CADC 1993), and courts have largely recognized that, to the extent nonparty enforcement of an injunction is available, the nonparty must stand in a close relationship to the plaintiff or have been specifically named in the injunction. See *United States* v. *American Soc. of Composers, Authors, and Publishers*, 341 F. 2d 1003, 1008 (CA2 1965) (nonparty could not enforce injunction where it was "not . . . named in the judgment" even though it was "indirectly or economically benefited by the decree").

osition is the practice of the High Court of Chancery in Eng-
land. *Ante*, at 6–7. But this cramped characterization of
the Judiciary's function is highly questionable when it
comes to suits against the Executive. That is, even if the
majority is correct that courts in England at the time of the
founding were so limited—and I have my doubts, see *ante*,
at 18–20 (SOTOMAYOR, J., dissenting)—why would courts in
*our* constitutional system be limited *in the same way*?

The Founders of the United States of America squarely
rejected a governing system in which the King ruled all, and
all others, including the courts, were his subordinates. In
our Constitution-centered system, the People are the rulers
and we have the rule of law. So, it makes little sense to look
to the relationship between English courts and the King for
guidance on the power of our Nation's Judiciary vis-à-vis its
Executive. See The Federalist No. 69, at 416 (A. Hamilton)
(explaining how the President differs from the King, includ-
ing because "[t]he person of the King of Great Britain is sa-
cred and inviolable; there is no constitutional tribunal to
which he is amenable"). Indeed, it is precisely because the
law constrains the Government in our system that the Ju-
diciary's assignment is so broad, per the Constitution. Fed-
eral courts entertain suits against the Government claim-
ing constitutional violations. Thus, the function of the
courts—both in theory and in practice—necessarily in-
cludes announcing what the law requires in such suits for
the benefit of all who are protected by the Constitution, not
merely doling out relief to injured private parties.

Put differently, the majority views the Judiciary's power
through an aperture that is much too small, leading it to
think that the *only* function of our courts is to provide "com-
plete relief" to private parties. Sure, federal courts do that,
and they do it well. But they *also* diligently maintain the
rule of law itself. When it comes to upholding the law, fed-
eral courts ensure that all comers—*i.e.*, everyone to whom

the law applies and over whom the court has personal jurisdiction (including and perhaps especially the Executive)—know what the law is and, most important, follow it.[3]

## III

Still, upon reading the Court's opinion, the majority's foundational mistake in mischaracterizing the true scope and nature of a federal court's power might seem only marginally impactful. Indeed, one might wonder: Why all the fuss? After all, the majority recognizes that district courts can still issue universal injunctions in some circumstances. See *ante*, at 16–18. It even acknowledges that the lower

---

[3] No one is saying that the reasoning of a district court's opinion, on its own, "has the legal force of a judgment," *ante*, at 22; of course it does not. The real issue today's applications raise is whether district-court opinions are entitled to respect while litigation over the lawfulness of the defendant's conduct is ongoing. As I have explained, the majority's key move is to start by assuming that the remedial power of federal courts is quite narrow (*i.e.*, it is only appropriately exercised to grant "complete relief" to the parties). *Ante*, at 5–11, 16. The majority forgets (or ignores) that federal courts also make pronouncements of law and issue orders compelling compliance if violations are identified. Then, having zeroed in on solely the courts' plaintiff-specific-remedies function, the majority unsurprisingly insists that a district court cannot respond to the Executive's decision to violate the law universally by issuing an order compelling universal cessation of the Executive's unlawful behavior. This kind of broad injunction is merely one tool in a judge's kit of remedial options—one that is directly responsive to the court's duty to uphold the law and the Executive's decision to consciously violate it—and it is no more or less binding than any of the district court's other determinations. So, rather than disdainfully securing permission to disregard the district court's opinion and continue engaging in unlawful conduct vis-à-vis anyone who is not the plaintiff, an enjoined Executive that believes the district court was wrong to conclude that its behavior is unlawful has a rule-of-law-affirming response at the ready: It can seek expedited review of the merits on appeal. District courts themselves also have the flexibility to stay their injunctions pending appeal, if that is requested and the circumstances demand it. But rather than permit lower courts to adapt their remedies to the particulars of a given case, the majority today ties judges' hands, requiring them to acquiesce to executive lawlessness in every situation.

courts may reimpose the same universal injunctions at issue in *these* cases, if the courts find on remand that doing so is necessary to provide complete relief to the named plaintiffs. See *ante*, at 19. From the standpoint of outcomes, that's all welcome news. But, as I explain below, from the perspective of constitutional theory and actual practice, disaster looms.

What I mean by this is that our rights-based legal system can only function properly if the Executive, and everyone else, is *always* bound by law. Today's decision is a seismic shock to that foundational norm. Allowing the Executive to violate the law at its prerogative with respect to anyone who has not yet sued carves out a huge exception—a gash in the basic tenets of our founding charter that could turn out to be a mortal wound. What is more, to me, requiring courts themselves to provide the dagger (by giving their *imprimatur* to the Executive Branch's intermittent lawlessness) makes a mockery of the Judiciary's solemn duty to safeguard the rule of law.

A

Do remember: The Executive has not asked this Court to determine whether Executive Order No. 14160 complies with the Constitution. Rather, it has come to us seeking the right to continue enforcing that order *regardless—i.e.*, even though six courts have now said the order is likely unconstitutional. What the Executive wants, in effect, is for this Court to bless and facilitate its desire to operate in two different zones moving forward: one in which it is required to follow the law (because a particular plaintiff has secured a personal injunction prohibiting its unlawful conduct), and another in which it can choose to violate the law with respect to certain people (those who have yet to sue).

In the first zone, law reigns. For the named plaintiffs in the suits before us, for example, the lower courts' determi-

nation that Executive Order No. 14160 is likely unconstitutional and cannot be implemented has teeth. Per the courts' orders, the Executive is prohibited from denying citizenship to the offspring of the named plaintiffs. See *ante*, at 26 (leaving the injunctions in place to the extent "necessary to provide complete relief to each plaintiff with standing to sue"). Within this zone, the courts' rule of decision—that Executive Order No. 14160 is likely unconstitutional—applies.

But with its ruling today, the majority endorses the creation of a second zone—one in which that rule of decision has no effect. In this zone, which is populated by those who lack the wherewithal or ability to go to court, all bets are off. There is no court-issued mandate requiring the Executive to honor birthright citizenship in compliance with the Constitution, so the people within this zone are left to the prerogatives of the Executive as to whether their constitutional rights will be respected. It does not matter what six federal courts have said about Executive Order No. 14160; those courts are powerless to make the Executive stop enforcing that order altogether. In effect, then, that powerlessness creates a void that renders the Constitution's constraints irrelevant to the Executive's actions. Of course, the Executive *might* choose to follow the law in this zone as well—but that is left to its discretion. And the Solicitor General has now confirmed that, in the absence of a personal injunction secured by a particular plaintiff, this Executive's view is that compliance with lower court rulings on matters of constitutional significance is optional.[4]

───────────

[4] The Solicitor General said that quiet part out loud by baldly asserting that the Executive reserves the right to defy Circuit precedent. Tr. of Oral Arg. 33–34, 60–61. Although he further suggested that the administration would abide by precedent from *this* Court in future similar cases, *id.*, at 35, 63, even that seems to be a matter of prerogative, as there is no inherent limit to the limited-scope-of-authority logic that underlies today's holding, see *ante*, at 41 (SOTOMAYOR, J., dissenting). The

I am not the first to observe that a legal system that operates on two different tracks (one of which grants to the Executive the prerogative to disregard the law) is anathema to the rule of law.[5]  Thus, the law-free zone that results from this Court's near elimination of universal injunctions is not an unfamiliar archetype.  Also eerily echoing history's horrors is the fact that today's prerogative zone is unlikely to impact the public in a randomly distributed manner.  Those in the good graces of the Executive have nothing to fear; the new prerogative that the Executive has to act unlawfully will not be exercised with respect to *them*.  Those who accede to the Executive's demands, too, will be in the clear.  The wealthy and the well connected will have little difficulty securing legal representation, going to court, and obtaining injunctive relief in their own name if the Executive violates their rights.

Consequently, the zone of lawlessness the majority has now authorized will disproportionately impact the poor, the

---

Executive's less-than-sterling record of compliance with Supreme Court rulings to date casts further doubt on this compliance claim; as JUSTICE SOTOMAYOR has explained, the Executive Order at issue here seems to squarely violate at least one—and perhaps five—of our bedrock precedents.  See *ante*, at 7–9 (dissenting opinion).

[5] See E. Fraenkel, The Dual State, pp. xiii, 3, 71 (1941) (describing the way in which the creation of a "Prerogative State" where the Executive "exercises unlimited arbitrariness . . . unchecked by any legal guarantees" is incompatible with the rule of law); see also J. Locke, Second Treatise of Civil Government 13 (J. Gough ed. 1948) ("[F]reedom of men under government is to have a standing rule to live by, common to every one of that society . . . and not to be subject to the . . . arbitrary will of another man"); The Federalist No. 26, p. 169 (C. Rossiter ed. 1961) (A. Hamilton) (contrasting the monarch's "prerogative" with the emergence of "liberty"); *Myers* v. *United States*, 272 U. S. 52, 295 (1926) (Brandeis, J., dissenting) ("[P]rotection of the individual . . . from the arbitrary or capricious exercise of power [is] an essential of free government"); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 641 (1952) (R. Jackson, J., concurring) (observing that our Constitution—which embodies the rule of law—does not grant to the Executive the "prerogative exercised by George III").

uneducated, and the unpopular—*i.e.*, those who may not have the wherewithal to lawyer up, and will all too often find themselves beholden to the Executive's whims. This is yet another crack in the foundation of the rule of law, which requires "equality and justice in its application." *Papachristou* v. *Jacksonville*, 405 U. S. 156, 171 (1972). In the end, though, everyone will be affected, because it is law's evenhanded application—"to minorities as well as majorities, to the poor as well as the rich"—that "holds society together." *Ibid.*

The majority "skips over" these consequences. *Ante*, at 23. No one denies that the power of federal courts is limited—both by the Constitution and by Congress. But the majority seems to forget (or ignores) that the Constitution and Congress also limit the power of the Executive. In addition, it is indisputable that the Executive's power to leverage physical force in a manner that directly threatens to deprive people of life, liberty, or property creates uniquely harmful risks when unconstrained by law. But the majority today roots its holding in a purported statutory limitation, not a constitutional one. *Ante*, at 5, n. 4. And, as I have explained, our Constitution gives federal courts the authority to order the Executive to stop acting unlawfully. See Part I, *supra.* To the extent Congress has attempted to strip federal courts of that power via the Judiciary Act (and, to be clear, I do not think it has, for the reasons JUSTICE SOTOMAYOR discusses, see *ante*, at 23–31), it is powerless to do so.

The bottom line is this: If courts do not have the authority to require the Executive to adhere to law universally, a dual-track system develops in which courts are ousted as guardians in some situations and compliance with law sometimes becomes a matter of executive prerogative. But "[t]here can be no free society without law administered through an independent judiciary." *Mine Workers*, 330 U. S., at 312 (opinion of Frankfurter, J.). "If one man"—

even a very important man, and even a democratically elected man—"can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny." *Ibid.*

### B

This leads me to another potentially destructive aspect of today's decision—the Court's dismissive treatment of the solemn duties and responsibilities of the lower courts. Sworn judicial officers must now put on blinders and take a see-no-evil stance with respect to harmful executive conduct, even though those same officials have already announced that such conduct is likely unconstitutional. Yes, certain named plaintiffs have brought particular lawsuits seeking protection of their legal rights. But their claim is that Executive Order No. 14160 violates the Constitution. If the court agrees with them, why on Earth must it permit that unconstitutional government action to take effect at all?

I have already explained why the majority's answer—because the court is powerless to do anything but give "complete relief" to those parties—is wrong in terms of the actual scope of federal courts' authority. See Part I, *supra.* I now observe that this response also erroneously suggests that a court does something wrongful when it imposes a universal injunction in a single plaintiff's lawsuit—akin to giving a windfall to those who do not deserve the law's protection because *they* have not sued. *Ante,* at 8–9, 12–15. This way of conceptualizing universal injunctions mistakes that remedy for the unearned spoils of particular adversarial engagements, rather than a necessary tool employed to defend the Constitution by reinforcing pre-existing rights.

Here is what I mean. Our Constitution indisputably con-

fers individual rights that operate as unequivocal protections against government action.[6]  Thus, a constrained Executive—*i.e.*, one who is bound by the Constitution not to violate people's rights—is a public benefit, guaranteed to all from the start, without regard to the nature or existence of any particular enforcement action.[7]  Properly understood, then, when the Executive violates those pre-existing rights in a nonparticularized manner, a universal injunction merely restores what the People were always owed; that remedy does *not* improperly distribute an unearned benefit to those who did not have the temerity to secure it for themselves by filing a lawsuit.

Or consider it the other way: When a court is prevented from enjoining the Executive universally after the Executive establishes a universal practice of stripping people's constitutional rights, anyone who is entitled to the Constitution's protection but will instead be subjected to the Executive's whims is improperly divested of their inheritance. The Constitution is flipped on its head, for its promises are essentially nullified.[8]  So, rather than having a governing

––––––––––

[6]See, *e.g.*, Amdt. 1 (prohibiting the government from preventing the "free exercise" of religion or "abridging the freedom of speech"); Amdt. 2 (prohibiting the government from infringing on the right "to keep and bear Arms"); Amdt. 4 (prohibiting the government from conducting "unreasonable searches and seizures"); Amdt. 5 (prohibiting the government from depriving persons of "life, liberty, or property, without due process of law").

[7]In this way of framing the issue, nonparties are more than mere "incidental" beneficiaries of universal injunctions that require the Executive to respect constitutional rights.  See n. 2, *supra*.  Rather, the very concept of constitutional rights makes the People *intended* beneficiaries of the constraints that the Constitution imposes on executive action.

[8]Again, the law binds the Executive from the outset in our constitutional scheme, for the benefit of all.  See Part I, *supra*.  Thus, a lawsuit is merely the vehicle that invokes the Judiciary's power to check the Executive by enforcing the law.  The topsy-turvy scheme the majority creates today gets those well-established norms exactly backward: The law disappears as an initial constraint on the Executive, and apparently only

system characterized by protected rights, the default becomes an Executive that can do whatever it wants to whomever it wants, unless and until each affected individual affirmatively invokes the law's protection.

A concrete example helps to illustrate why this turnabout undermines the rule of law. Imagine an Executive who issues a blanket order that is blatantly unconstitutional—demanding, say, that any and all of its political foes be summarily and indefinitely incarcerated in a prison outside the jurisdiction of the United States, without any hearing or chance to be heard in court. Shortly after learning of this edict, one such political rival rushes into court with his lawyer, claims the Executive's order violates the Constitution, and secures an injunction that prohibits the Executive from enforcing that unconstitutional mandate. The upshot of today's decision is that, despite that rival's success in persuading a judge of the unconstitutional nature of the Executive's proclamation, the court's ruling and injunction can *only* require the Executive to shelve any no-process incarceration plan that targets *that particular individual* (the named plaintiff ); the Executive can keep right on rounding up its other foes, despite the court's clear and unequivocal pronouncement that the executive order is unlawful.

The majority today says that, unless and until the other political rivals seek and secure their own personal injunctions, the Executive can carry on acting unconstitutionally with respect to each of them, as if the Constitution's due process requirement does not exist. For those who get to court in time, their right not to be indefinitely imprisoned without due process will be protected. But if they are unable to sue or get to the courthouse too late, the majority says, oh well, there is nothing to be done, despite the fact

————————

exists if a particular plaintiff files a particular lawsuit in a particular court, claiming his (particular) entitlement.

that their detention without due process is plainly prohibited by law.

A Martian arriving here from another planet would see these circumstances and surely wonder: "*what good is the Constitution, then*?" What, really, is this system for protecting people's rights if it amounts to *this*—placing the onus on the victims to invoke the law's protection, and rendering the very institution that has the singular function of ensuring compliance with the Constitution powerless to prevent the Government from violating it? "Those things Americans call constitutional rights seem hardly worth the paper they are written on!"

These observations are indictments, especially for a Nation that prides itself on being fair and free. But, after today, that is where we are. What the majority has done is allow the Executive to nullify the statutory and constitutional rights of the uncounseled, the underresourced, and the unwary, by prohibiting the lower courts from ordering the Executive to follow the law across the board. Moreover, officers who have sworn an oath to uphold the law are now required to allow the Executive to blatantly violate it. Federal judges pledge to support and defend the Constitution of the United States against all enemies, foreign or domestic. 5 U. S. C. §3331. They do *not* agree to permit unconstitutional behavior by the Executive (or anyone else). But the majority forgets (or ignores) this duty, eagerly imposing a limit on the power of courts that, in essence, prevents judges from doing what their oaths require.[9]

_____

[9] The majority highlights a number of policy concerns that some say warrant restriction of the universal-injunction remedy. *Ante*, at 20–21. In my view, those downsides pale in comparison to the consequences of forcing federal courts to acquiesce to executive lawlessness. Moreover, and in any event, the various practical problems critics have identified are largely overblown. For example, while many accuse universal injunctions of preventing percolation, the facts of this very suit demonstrate otherwise: Three different District Courts each considered the merits of Executive Order No. 14160, and appeals are now pending in

I view the demise of the notion that a federal judge can order the Executive to adhere to the Constitution—full stop—as a sad day for America. The majority's unpersuasive effort to justify this result makes it sadder still. It is the responsibility of each and every jurist to hold the line. But the Court now requires judges to look the other way after finding that the Executive is violating the law, shamefully permitting unlawful conduct to continue unabated.

Today's ruling thus surreptitiously stymies the Judiciary's core duty to protect and defend constitutional rights. It does this indirectly, by preventing lower courts from telling the Executive that it has to stop engaging in conduct that violates the Constitution. Instead, now, a court's power to prevent constitutional violations comes with an asterisk—a court can make the Executive cease its unconstitutional conduct *but* only with respect to the particular plaintiffs named in the lawsuit before them, leaving the Executive free to violate the constitutional rights of anyone and everyone else.

———————
three Courts of Appeals. See *supra*, at 7. Other prudential concerns are better addressed in more targeted ways, such as by changing venue rules to prevent forum or judge shopping, or by encouraging lower courts to expedite their review, thereby teeing the merits up for this Court as quickly as possible.

That is not to say that universal injunctions can or should be issued in every case; a court must always fit its remedy to the particular case before it, and those particulars may caution against issuing universal relief in certain instances. See *ante*, at 22–23 (SOTOMAYOR, J., dissenting). But the Court today for the first time ever adopts a blanket authority-diminishing rule: It declares that courts do not have the power to exercise their equitable discretion to order the Executive to completely cease acting pursuant to an unlawful directive (unless doing so is necessary to provide complete relief to a given plaintiff). And, again, this very suit illustrates why that bright line rule goes much too far. As JUSTICE SOTOMAYOR emphasizes, multiple courts have recognized that Executive Order No. 14160 is "patently unconstitutional under settled law," and those courts thus issued the relief necessary to "protect newborns from the exceptional, irreparable harm associated with losing a foundational constitutional right and its immediate benefits." *Ibid.*

JACKSON, J., dissenting

\*     \*     \*

Make no mistake: Today's ruling allows the Executive to deny people rights that the Founders plainly wrote into our Constitution, so long as those individuals have not found a lawyer or asked a court in a particular manner to have their rights protected. This perverse burden shifting cannot co-exist with the rule of law. In essence, the Court has now shoved lower court judges out of the way in cases where executive action is challenged, and has gifted the Executive with the prerogative of sometimes disregarding the law. As a result, the Judiciary—the one institution that is solely responsible for ensuring our Republic endures as a Nation of laws—has put both our legal system, and our system of government, in grave jeopardy.

"The accretion of dangerous power does not come in a day." *Youngstown*, 343 U. S., at 594 (opinion of Frankfurter, J.). But "[i]t does come," "from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Ibid.* By needlessly granting the Government's emergency application to prohibit universal injunctions, the Court has cleared a path for the Executive to choose law-free action at this perilous moment for our Constitution—right when the Judiciary should be hunkering down to do all it can to preserve the law's constraints. I have no doubt that, if judges must allow the Executive to act unlawfully in some circumstances, as the Court concludes today, executive lawlessness will flourish, and from there, it is not difficult to predict how this all ends. Eventually, executive power will become completely uncontainable, and our beloved constitutional Republic will be no more.

Perhaps the degradation of our rule-of-law regime would happen anyway. But this Court's complicity in the creation of a culture of disdain for lower courts, their rulings, and the law (as they interpret it) will surely hasten the downfall

of our governing institutions, enabling our collective demise. At the very least, I lament that the majority is so caught up in minutiae of the Government's self-serving, finger-pointing arguments that it misses the plot. The majority forgets (or ignores) that "[w]ith all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations." *Id.*, at 655 (opinion of R. Jackson, J.). Tragically, the majority also shuns this prescient warning: Even if "[s]uch institutions may be destined to pass away," "it is the duty of the Court to be last, not first, to give them up." *Ibid.*